# CALIFORNIA *v.* FEDERAL ENERGY REGULATORY COMMISSION ET AL.

No. 89–333.   Argued March 20, 1990—Decided May 21, 1990

491

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Roderick E. Walston*, Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van de Kamp*, Attorney General, *R. H. Connett*, Assistant Attorney General, and *Clifford T. Lee*, Deputy Attorney General.

*Stephen L. Nightingale* argued the cause for respondents. With him on the brief for respondent Federal Energy Regulatory Commission were *Solicitor General Starr, Deputy Solicitor General Merrill, Jerome M. Feit, Joseph S. Davies*, and *Raymond E. Hagenlock. Louis Touton* and *Erwin N. Griswold* filed a brief for respondent Rock Creek Limited Partnership.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Idaho et al. by *Jim Jones*, Attorney General, and *Clive J. Strong*, Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Douglas B. Baily* of Alaska, *Robert K. Corbin* of Arizona, *Steve Clark* of Arkansas, *Duane Woodard* of Colorado, *Clarine Nardi Riddle* of Connecticut, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia,

JUSTICE O'CONNOR delivered the opinion of the Court.

This case concerns overlapping federal and state regulation of a hydroelectric project located near a California stream. California seeks to ensure that the project's operators maintain water flowing in the stream sufficient, in the State's judgment, to protect the stream's fish. The Federal Government claims the exclusive authority to set the minimum stream flows that the federally licensed powerplant must maintain. Each side argues that its position is consistent with the Federal Power Act, ch. 285, 41 Stat. 1063, as

*Warren Price III* of Hawaii, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Tom Miller* of Iowa, *Robert T. Stephan* of Kansas, *Frederic J. Cowan* of Kentucky, *William J. Guste, Jr.*, of Louisiana, *James E. Tierney* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *James M. Shannon* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Robert M. Spire* of Nebraska, *Brian McKay* of Nevada, *John P. Arnold* of New Hampshire, *Peter N. Perretti, Jr.*, of New Jersey, *Hal Stratton* of New Mexico, *Robert Abrams* of New York, *Lacy H. Thornburg* of North Carolina, *Nicholas Spaeth* of North Dakota, *Anthony J. Celebrezze, Jr.*, of Ohio, *Robert H. Henry* of Oklahoma, *Dave Frohnmayer* of Oregon, *Ernest D. Preate, Jr.*, of Pennsylvania, *James E. O'Neil* of Rhode Island, *T. Travis Medlock* of South Carolina, *Roger A. Tellinghuisen* of South Dakota, *Charles W. Burson* of Tennessee, *Jim Mattox* of Texas, *Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, *Mary Sue Terry* of Virginia, *Kenneth O. Eikenberry* of Washington, *Roger Tompkins* of West Virginia, *Donald J. Hanaway* of Wisconsin, and *Joseph B. Meyer* of Wyoming; for American Rivers et al. by *Steven W. Weston;* and for the Council of State Governments et al. by *Benna Ruth Solomon* and *Richard J. Lazarus.*

Briefs of *amici curiae* urging affirmance were filed for the City of Klamath Falls, Oregon, by *Edward Weinberg* and *Richmond F. Allan;* for the Edison Electric Institute et al. by *Jerome C. Muys, Peter Kelsey, Robert L. McCarty, Wallace F. Tillman,* and *William J. Madden;* for the Modesto Irrigation District et al. by *Joel S. Moskowitz* and *Gregory J. Kerwin;* for Pacific Gas and Electric Company et al. by *Jack F. Fallin, Jr., Howard V. Golub, Thomas H. Nelson,* and *Jody L. Williams;* and for Pacific Northwest Utilities by *Jay T. Waldron.*

*Antonio Cosby-Rossmann* filed a brief for the County of Inyo et al. as *amici curiae.*

amended, 16 U. S. C. § 791a *et seq.* (1982 ed.), and, in particular, with § 27 of that Act. We granted certiorari to resolve these competing claims.

## I

The Rock Creek hydroelectric project lies near the confluence of the South Fork American River and one of the river's tributaries, Rock Creek. Rock Creek runs through federally managed land located within California. The project draws water from Rock Creek to drive its generators and then releases the water near the confluence of the stream and river, slightly less than one mile from where it is drawn. The state and federal requirements at issue govern the "minimum flow rate" of water that must remain in the bypassed section of the stream and that thus remains unavailable to drive the generators.

In 1983, pursuant to the Federal Power Act (FPA or Act), the Federal Energy Regulatory Commission (FERC) issued a license authorizing the operation of the Rock Creek project. *Keating,* 23 FERC ¶ 62,137. Section 4(e) of the FPA empowers FERC to issue licenses for projects "necessary or convenient . . . for the development, transmission, and utilization of power across, along, from, or in any of the streams . . . over which Congress has jurisdiction." 16 U. S. C. § 797(e) (1982 ed.). Section 10(a) of the Act also authorizes FERC to issue licenses subject to the conditions that FERC deems best suited for power development and other public uses of the waters. 16 U. S. C. § 803(a) (1982 ed.). Congress' subsequent amendments to those provisions expressly direct that FERC consider a project's effect on fish and wildlife as well as "power and development purposes." Electric Consumers Protection Act of 1986, Pub. L. 99–495, 100 Stat. 1243, 16 U. S. C. §§ 797(e), 803(a)(1). FERC issued the 1983 license and set minimum flow rates after considering the project's economic feasibility and environmental consequences. In part to protect trout in the stream, the license

required that the project maintain interim minimum flow rates of 11 cubic feet per second (cfs) during May through September and 15 cfs during the remainder of the year. 23 FERC ¶ 62,137, at 63,204. The license also required the licensee to submit studies recommending a permanent minimum flow rate, after consulting with federal and state fish and wildlife protection agencies. *Ibid.* In 1985, the licensee submitted a report recommending that FERC adopt the interim flow rates as permanent rates. The California Department of Fish and Game (CDFG) recommended that FERC require significantly higher minimum flow rates.

The licensee had also applied for state water permits, and in 1984 the State Water Resources Control Board (WRCB) issued a permit that conformed to FERC's interim minimum flow requirements but reserved the right to set different permanent minimum flow rates. App. 65–67. When the WRCB in 1987 considered a draft order requiring permanent minimum flow rates of 60 cfs from March through June and 30 cfs during the remainder of the year, the licensee petitioned FERC for a declaration that FERC possessed exclusive jurisdiction to determine the project's minimum flow requirements. *Rock Creek Limited Partnership*, 38 FERC ¶ 61,240, p. 61,772 (1987). The licensee, by then respondent Rock Creek Limited Partnership, also claimed that the higher minimum flow rates sought by the WRCB would render the project economically infeasible. *Ibid.*

In March 1987, FERC issued an order directing the licensee to comply with the minimum flow requirements of the federal permit. In that order, FERC concluded that the task of setting minimum flows rested within its exclusive jurisdiction. *Id.*, at 61,774. The Commission reasoned that setting minimum flow requirements was integral to its planning and licensing process under FPA § 10(a); giving effect to competing state requirements "would interfere with the Commission's balancing of competing considerations in licensing" and would vest in States a veto power over federal

projects inconsistent with the FPA, as interpreted in *First Iowa Hydro-Electric Cooperative* v. *FPC*, 328 U. S. 152 (1946). 38 FERC, at 61,773. FERC also directed an Administrative Law Judge to hold a hearing to determine the appropriate permanent minimum flow rates for the project. *Id.*, at 61,774. After considering proposals and arguments of the licensee, the CDFG, and FERC staff, the Administrative Law Judge set the minimum flow rate for the project at 20 cfs during the entire year. *Rock Creek Limited Partnership*, 41 FERC ¶ 63,019 (1987). Four days after FERC's declaratory order, the WRCB issued an order directing the licensee to comply with the higher minimum flow requirements contained in its draft order. App. 73. The WRCB also intervened to seek a rehearing of FERC's order. FERC denied the rehearing request, concluded that the State sought to impose conflicting license requirements, and reaffirmed its conclusion that the FPA, as interpreted in *First Iowa,* provided FERC with exclusive jurisdiction to determine minimum flow rates. *Rock Creek Limited Partnership*, 41 FERC ¶ 61,198 (1987).

The Court of Appeals for the Ninth Circuit affirmed FERC's order denying rehearing. *California ex rel. State Water Resources Board* v. *FERC*, 877 F. 2d 743 (1989). That court, too, concluded that *First Iowa* governed the case; that FPA § 27 as construed in *First Iowa* did not preserve California's right to regulate minimum flow rates; and that the FPA pre-empted WRCB's minimum flow rate requirements. *Ibid.* We granted certiorari, 493 U. S. 991 (1989), and we now affirm.

II

In the Federal Power Act of 1935, 49 Stat. 863, Congress clearly intended a broad federal role in the development and licensing of hydroelectric power. That broad delegation of power to the predecessor of FERC, however, hardly determines the extent to which Congress intended to have the Federal Government exercise exclusive powers, or intended

to pre-empt concurrent state regulation of matters affecting federally licensed hydroelectric projects. The parties' dispute regarding the latter issue turns principally on the meaning of § 27 of the FPA, which provides the clearest indication of how Congress intended to allocate the regulatory authority of the States and the Federal Government. That section provides:

> "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." 16 U. S. C. § 821 (1982 ed.).

Were this a case of first impression, petitioner's argument based on the statute's language could be said to present a close question. As petitioner argues, California's minimum stream flow requirement might plausibly be thought to "relat[e] to the control, appropriation, use, or distribution of water used . . . for . . . other uses," namely the generation of power or the protection of fish. This interpretation would accord with the "presumption against finding pre-emption of state law in areas traditionally regulated by the States" and "'with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *California* v. *ARC America Corp.*, 490 U. S. 93, 101 (1989), quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947); see *California* v. *United States*, 438 U. S. 645, 653–663 (1978) (tracing States' traditional powers over exploitation of water). Just as courts may not find state measures pre-empted in the absence of clear evidence that Congress so intended, so must they give full effect to evidence that Congress considered, and sought to preserve, the States' coordinate regulatory role in our federal scheme.

But the meaning of § 27 and the pre-emptive effect of the FPA are not matters of first impression. Forty-four

years ago, this Court in *First Iowa* construed the section and provided the understanding of the FPA that has since guided the allocation of state and federal regulatory authority over hydroelectric projects. The Court interpreted § 27 as follows:

> "The effect of § 27, in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses *of the same nature*. It therefore has primary, if not exclusive, reference to such *proprietary rights*. The phrase 'any vested right acquired therein' further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope unless it be the words 'other uses.' Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes." *First Iowa*, 328 U. S., at 175–176 (emphasis added).

The Court interpreted § 27's reservation of limited powers to the States as part of the congressional scheme to divide state from federal jurisdiction over hydroelectric projects and, "in those fields where rights are not thus 'saved' to the States . . . to let the supersedure of the state laws by federal legislation take its natural course." *Id.*, at 176.

We decline at this late date to revisit and disturb the understanding of § 27 set forth in *First Iowa*. As petitioner prudently concedes, Tr. of Oral Arg. 7, *First Iowa*'s interpretation of § 27 does not encompass the California regulation at issue: California's minimum stream flow requirements neither reflect nor establish "proprietary rights" or "rights of the same nature as those relating to the use of water in irrigation or for municipal purposes." *First Iowa*, *supra*, at 176; see *Fullerton* v. *State Water Resources Control Board*, 90 Cal. App. 3d 590, 153 Cal. Rptr. 518 (1979); accord, *California Trout, Inc.* v. *State Water Resources Control Board*, 90 Cal. App. 3d 816, 153 Cal. Rptr. 672 (1979). Instead, pe-

titioner requests that we repudiate *First Iowa*'s interpretation of § 27 and the FPA. This argument misconceives the deference this Court must accord to longstanding and well-entrenched decisions, especially those interpreting statutes that underlie complex regulatory regimes. Adherence to precedent is, in the usual case, a cardinal and guiding principle of adjudication, and "[c]onsiderations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989). There has been no sufficient intervening change in the law, or indication that *First Iowa* has proved unworkable or has fostered confusion and inconsistency in the law, that warrants our departure from established precedent. Cf. *id.*, at 173. This Court has endorsed and applied *First Iowa*'s limited reading of § 27, see *FPC* v. *Oregon*, 349 U. S. 435 (1955); cf. *FPC* v. *Niagara Mohawk Power Corp.*, 347 U. S. 239 (1954), and has employed the decision with approval in a range of decisions, both addressing the FPA and in other contexts. See, *e. g.*, *New England Power Co.* v. *New Hampshire*, 455 U. S. 331, 338, n. 6 (1982); *Escondido Mut. Water Co.* v. *La Jolla Band of Mission Indians*, 466 U. S. 765, 773 (1984); *City of Tacoma* v. *Taxpayers of Tacoma*, 357 U. S. 320, 334 (1958); *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 223, n. 34 (1983). By directing FERC to consider the recommendations of state wildlife and other regulatory agencies while providing FERC with final authority to establish license conditions (including those with terms inconsistent with the States' recommendations), Congress has amended the FPA to elaborate and reaffirm *First Iowa*'s understanding that the FPA establishes a broad and paramount federal regulatory role. See 16 U. S. C. §§ 803(a)(1)–(3) (FERC to issue license on conditions that protect fish and wildlife, after considering

recommendations of state agencies), as amended by the Electric Consumers Protection Act of 1986, 16 U. S. C. §§ 803(j) (1)–(2) (FERC license conditions protecting fish and wildlife to be based on recommendations of federal and state wildlife agencies, with FERC to issue findings if it adopts conditions contrary to recommendations); cf. *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 424 (1986) ("We are especially reluctant to reject this presumption [of adherence to precedent] in an area that has seen careful, intense, and sustained congressional attention").

Petitioner asks this Court fundamentally to restructure a highly complex and long-enduring regulatory regime, implicating considerable reliance interests of licensees and other participants in the regulatory process. That departure would be inconsistent with the measured and considered change that marks appropriate adjudication of such statutory issues. See *Square D Co., supra*, at 424 (for statutory determinations, "'it is more important that the applicable rule of law be settled than that it be settled right. . . . This is commonly true, even where the error is a matter of serious concern, provided correction can be had by legislation,'" quoting *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting)).

Petitioner also argues that we should disregard *First Iowa*'s discussion of § 27 because it was merely dictum. It is true that our immediate concern in *First Iowa* was the interpretation of § 9(b) of the FPA, which governs submission to the federal licensing agency of evidence of compliance with state law.[1] The Court determined that § 9(b) did not require

---

[1] Section 9(b), 16 U. S. C. § 802(a)(2) (formerly 16 U. S. C. § 802(b) (1982 ed.)), provides:

"(a) Each applicant for a license under this chapter shall submit to the commission—

. . . . .

"(2) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed

licensees to obtain a state permit or to demonstrate compliance with the state law prerequisites to obtaining such a permit. *First Iowa,* 328 U. S., at 163–164, 167, 177. Instead, the Court construed the section merely as authorizing the federal agency to require evidence of actions consistent with the federal permit. *Id.,* at 167–169, 177–179. *First Iowa's* limited reading of § 27 was, however, necessary for, and integral to, that conclusion. Like this case, *First Iowa* involved a state permit requirement that related to the control of water for particular uses but that did not relate to or establish proprietary rights. Iowa had required as one condition of securing a state permit that diverted water be "returned . . . at the nearest practicable place without being materially diminished in quantity or polluted or rendered deleterious to fish life," Iowa Code § 7771 (1939), a provision the Court found to conflict with the federal requirements and to "strik[e] at the heart of the present project." *First Iowa,* 328 U. S., at 166–167, 170–171. The Court reasoned that, absent an express congressional command, § 9(b) could not be read to require compliance with, and thus to preserve, state laws that conflicted with and were otherwise pre-empted by the federal requirements. See *id.,* at 166–167 ("If a state permit is not required, there is no justification for requiring the petitioner, as a condition of securing its federal permit, to present evidence of the petitioner's compliance with the requirements of the State Code for a state permit"); *id.,* at 177. Only the Court's narrow reading of § 27 allowed it to sustain this interpretation of § 9(b). Had § 27 been given the broader meaning that Iowa sought, it would have "saved" the state requirements at issue, made the state permit one that could be issued, and supported the interpretation of § 9(b) as

---

project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting and distributing power, and in any other business necessary to effect the purposes of a license under this chapter."

requiring evidence of compliance with those state require-
ments, rather than compliance only with those requirements
consistent with the federal license.

The Court's related, but more general, rationale for its
reading of § 9(b) in *First Iowa* also necessarily rested on its
narrow construction of § 27. The Court framed the issue as
whether the Act allowed the States to regulate through per-
mit requirements such as Iowa's "the very requirements of
the project that Congress has placed in the discretion of the
Federal Power Commission." *Id.*, at 165 (footnote citing
FPA § 10(a) omitted). The Court rejected the possibility of
concurrent jurisdiction and interpreted the FPA as mandat-
ing divided powers and "a dual system involving the close
integration of these powers rather than a dual system of
futile duplication of two authorities over the same subject
matter." *Id.*, at 171; see *id.*, at 174 (no "divided authority
over any one subject"); *id.*, at 181 (comprehensive federal
role "leave[s] no room or need for conflicting state controls").
Section 9 reflected the operation of this exclusive federal au-
thority. See *id.*, at 167–169; *id.*, at 168 ("Where the Federal
Government supersedes the state government there is no
suggestion that the two agencies both shall have final author-
ity"). In accord with this view, the Court interpreted § 9(b)
as requiring compliance only with state measures relevant to
federal requirements rather than, as would exist under a sys-
tem of concurrent jurisdiction, compliance with the state
requirements necessary to secure the state permit. *Id.*,
at 167–169. Instead, only § 27 preserved and defined the
States' exclusive regulatory sphere. *Id.*, at 175–178. That
is, the Court rejected an interpretation of § 9(b) that would
have "saved" or accommodated the state permit system and
its underlying requirements. To reach its interpretation of
§ 9(b), however, the Court had to interpret § 27 consistently
with the limited state regulatory sphere and in a manner that
did not, by "saving" the Iowa requirements, establish "di-
vided authority over any one subject." *Id.*, at 174. Con-

stricting § 27 to encompass only laws relating to proprietary rights, and thus leaving the permit requirements at issue to the federal sphere, accomplished that goal. The Court's discussion immediately after its extended discussion of § 27 illustrates the relation between the sections. Before distinguishing § 27's role in saving state law from § 9(b)'s role in the sphere of exclusive federal regulation, the Court concluded:

> "[Section 27] is therefore thoroughly consistent with the integration rather than the duplication of federal and state jurisdictions under the Federal Power Act. It strengthens the argument that, in those fields where rights are not thus "saved" to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course." *Id.*, at 176.

The Court's interpretation of § 9(b), of course, rested on that supersedure and required that the remaining field "saved" to the States by § 27 be limited correspondingly.

Petitioner also argues that our decision in *California* v. *United States*, 438 U. S. 645 (1978), construing § 8 of the Reclamation Act of 1902,[2] requires that we abandon *First Iowa's* interpretation of § 27 and the FPA. Petitioner reasons that § 8 is similar to, and served as a model for, FPA § 27, that this Court in *California* v. *United States* interpreted § 8 in a manner inconsistent with *First Iowa's* reading of § 27, and that that reading of § 8, subsequent to *First Iowa*, in some manner overrules or repudiates *First Iowa's* understanding of § 27.

---

[2] Section 8 of the Reclamation Act of 1902, 32 Stat. 390, now 43 U. S. C. §§ 372, 383 (1982 ed.), provided in part:

"[N]othing in this Act shall be construed as affecting or intended to affect or in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof . . . ."

*California* v. *United States* is cast in broad terms and embodies a conception of the States' regulatory powers in some tension with that set forth in *First Iowa*, but that decision bears quite indirectly, at best, upon interpretation of the FPA. The Court in *California* v. *United States* interpreted the Reclamation Act of 1902; it did not advert to, or purport to interpret, the FPA, and held simply that § 8 requires the Secretary of the Interior to comply with state laws, not inconsistent with congressional directives, governing use of water employed in federal reclamation projects. *California* v. *United States, supra.* Also, as in *First Iowa*, the Court in *California* v. *United States* examined the purpose, structure, and legislative history of the entire statute before it and employed those sources to construe the statute's saving clause. See 438 U. S., at 649–651, 653–670, 674–675. Those sources indicate, of course, that the FPA envisioned a considerably broader and more active federal oversight role in hydropower development than did the Reclamation Act. Compare FPA §§ 4, 9, 10, as codified, 16 U. S. C. §§ 797, 802, 803, and *First Iowa*, 328 U. S., at 164, 167–169, 171–174, 179–181, with Reclamation Act of 1902 §§ 1, 2, 32 Stat. 388, as codified, 43 U. S. C. §§ 391, 411 (1982 ed.), and *California* v. *United States, supra*, at 649–651, 663–670.

Even if the two saving clauses were properly viewed in isolation from the remainder of their respective Acts and resulting regulatory schemes, significant differences exist between them. Section 8 of the Reclamation Act, after referring to state water laws relating to water used in irrigation and preserved by the Act, contains an explicit direction that "the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such [state] laws." 43 U. S. C. § 383 (1982 ed.). This language has no counterpart in § 27 of the FPA and was crucial to the Court's interpretation of § 8. See *California* v. *United States, supra*, at 650, 664–665, 674–675. Although *California* v. *United States* and *First Iowa* accord different effect to laws relating

to water uses, this difference stems in part from the different roles assumed by the federal actor in each case, as reflected in § 8's explicit directive to the Secretary. The Secretary in executing a particular reclamation project is in a position analogous to a licensee under the FPA and need not comply with state laws conflicting with congressional directives respecting particular reclamation projects, see 438 U. S., at 672–674; similarly, a federal licensee under the FPA need not comply with state requirements that conflict with the federal license provisions established pursuant to the FPA's directives. An additional textual difference is that § 8 refers only to "water used in irrigation" and contains no counterpart to § 27's reference to "other uses," the provision essential to petitioner's argument. Laws controlling water used in irrigation relate to proprietary rights, as the *First Iowa* Court indicated, 328 U. S., at 176, and n. 20, and § 8 does not indicate the appropriate treatment of laws relating to other water uses that do not implicate proprietary rights.

Given these differences between the statutes and saving provisions, it should come as no surprise that *California* v. *United States* did not refer either to § 27 or to *First Iowa*. Since the Court decided *California* v. *United States*, we have continued to cite *First Iowa* with approval. See, *e. g.*, *Escondido Mut. Water Co.*, 466 U. S., at 773; *Pacific Gas & Electric Co.*, 461 U. S., at 223, n. 34; *New England Power Co.*, 455 U. S., at 338, n. 6. We do not believe that *California* v. *United States* requires that we disavow *First Iowa* in this case.

Finally, petitioner argues that § 27's legislative history requires us to abandon *First Iowa*'s interpretation of that section. Whatever the usefulness of legislative history for statutory interpretation in the usual case, that source provides petitioner with no aid. If a quite natural reading of the statutory language fails to displace an intervening decision providing a contrary interpretation, legislative history supporting that reading and by definition before the Court that

has already construed the statute provides little additional reason to overturn the decision. Cf. *Patterson*, 491 U. S., at 172–174 (reviewing sources most likely to prompt overruling of decision). Indeed, *First Iowa* expressly considered the legislative history of the FPA and of § 27 in particular and found that source to support its interpretation of both. *First Iowa, supra*, at 171–174, 176, n. 20, 179. Given the tangential relation of the legislative history to the issue at hand and the interests supporting adherence to *First Iowa*, we decline to parse again the legislative history to determine whether the Court in *First Iowa* erred in its understanding of the development, as well as the meaning, of the statute.

Adhering to *First Iowa*'s interpretation of § 27, we conclude that the California requirements for minimum instream flows cannot be given effect and allowed to supplement the federal flow requirements. A state measure is "pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984) (citations omitted). As Congress directed in FPA § 10(a), FERC set the conditions of the license, including the minimum stream flow, after considering which requirements would best protect wildlife and ensure that the project would be economically feasible, and thus further power development. See *Rock Creek Limited Partnership*, 41 FERC ¶ 63,019 (1987); *Keating*, 23 FERC ¶ 62,137 (1983); see also *Rock Creek Limited Partnership*, 41 FERC ¶ 61,198 (1987). Allowing California to impose significantly higher minimum stream flow requirements would disturb and conflict with the balance embodied in that considered federal agency determination. FERC has indicated that the California requirements interfere with its comprehensive planning authority, and we agree that allowing California to impose the challenged requirements would be contrary to congressional in-

tent regarding the Commission's licensing authority and would "constitute a veto of the project that was approved and licensed by FERC." 877 F. 2d, at 749; cf. *First Iowa, supra,* at 164–165.

For the foregoing reasons, the decision of the Court of Appeals for the Ninth Circuit is

*Affirmed.*