# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


## 11-1146


## JEANNIE HURST SIMMONS, ET AL.

## VERSUS

## SABINE RIVER AUTHORITY OF LOUISIANA, ET AL.


**\*\*\*\*\*\*\*\*\*\***
## WRIT APPLICATION FROM THE
## THIRTIETH JUDICIAL DISTRICT COURT
## PARISH OF VERNON, DOCKET NO. 73,524
## HONORABLE VERNON B. CLARK, DISTRICT JUDGE
**\*\*\*\*\*\*\*\*\*\***


## SYLVIA R. COOKS
## JUDGE

**\*\*\*\*\*\*\*\*\*\***


Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Marc T. Amy, Judges.

**WRIT DENIED.**


**Amy, J., dissents and assigns reasons.**

Andrew L. Plauche, Jr.
G. Bruce Parkerson
Scott H. Mason
Plauche Maselli Parkerson L.L.P.
701 Poydras Street, Suite 3800
New Orleans, LA 70139
(504) 582-1142
**ATTORNEY FOR DEFENDANT/RELATOR**
        Associated Electric & Gas Insurance Services, Ltd.

John Sturgeon
Sturgeon & Boyd
209 Texas Avenue
P.O. Drawer 1463
Ferriday, LA 71334
(318) 757-4151
**ATTORNEY FOR PLAINTIFFS/RESPONDENTS**
        Jeannie Hurst Simmons, et al.

Donald T. Carmouche
Victor L. Marcello
John H. Carmouche
William R. Coenen, III
John S. DuPont, III
Brian T. Carmouche
D. Adele Owen
Talbot, Carmouche & Marcello
17405 Perkins Road
Baton Rouge, LA  70810
(225) 400-9991
**ATTORNEY FOR PLAINTIFFS/RESPONDENTS**
Jeannie Hurst Simmons, et al.

**COOKS, Judge.**

Relator, Associated Electric & Gas Insurance Services, Ltd. (hereafter Associated), seeks supervisory writs from the district court judgment denying its motion for summary judgment.

### FACTS AND PROCEDURAL HISTORY

This case involves survival and wrongful death actions filed by Plaintiffs-Relators, Jeannie Hurst Simmons, and her daughters, Tressa and Brianna. Jeannie Simmons was married to Kyle Simmons, and they had three children together, Tressa, Brianna and Christopher.

In March 2001, the Sabine River Authority of Louisiana (hereafter SRA), which operated the Toledo Bend Dam pursuant to a license issued by the Federal Power Commission, made a decision to open the flood gates of the dam. This allegedly led to catastrophic flooding of the Sabine River downstream from the dam.

Plaintiffs contend they, and other residents of the flooded area, were required to depend entirely on their own means of transportation to reach land. On March 22, 2001, Kyle Simmons used a 14-foot long aluminum boat to transport his daughters to school, bringing along his young son, Christopher. On the return trip home after dropping the girls off, Kyle and Christopher were thrown from the boat and killed. Plaintiffs alleged this unfortunate accident occurred because Kyle was unable to negotiate the swollen Sabine River in his small boat.

Plaintiffs filed suit against various defendants, including the SRA and Associated, which is the excess insurer of the SRA. Plaintiffs allege the SRA was negligent in the following particulars: (1) its decision to release water from the floodgate; (2) its failure to warn Plaintiffs of the potential for flooding; and, (3) its failure to provide alternate transportation for Plaintiffs. Plaintiffs allege that Associated is liable to them as an excess insurer of the SRA. Although Plaintiffs

settled their claims against the SRA and its primary insurer, their claims against Associated, as excess insurer, are still pending.

Associated filed a motion for summary judgment, arguing Plaintiffs' claims are preempted by federal law and, alternatively, that the SRA neither owed nor breached a duty to Plaintiffs. The trial court denied Associated's motion for summary judgment, and Associated sought writs to this court for a review of that ruling. For the following reasons, finding no error in the trial court's ruling, we deny the writ application.

## ANALYSIS

The law is clear that federal preemption "fundamentally is a question of congressional intent." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275 (1990). In *Louisiana Public Service Commission v. Federal Communications Commission*, 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898 (1996) (citations omitted), the United States Supreme Court stated:

> Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, *e.g.*, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for states to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

Associated argues Plaintiffs' state law claims are preempted by the Federal Power Act (FPA), 16 U.S.C. § 791a *et seq.*, which Associated contends vests the Federal Power Commission (FPC) and its successor agency, the Federal Energy Regulatory Commission (FERC), with exclusive authority to issue licenses to and regulate hydropower facilities in navigable waters. Citing *California v. F.E.R.C.*, 495 U.S. 490, 110 S.Ct. 2024 (1990), and *First-Iowa Hydro-Electric Cooperative v. Federal Power Commission*, 328 U.S. 152, 66 S.Ct. 906 (1946), Associated contends, while the FPA grants the federal government exclusive control over the

4

engineering, economic and financial aspects of the federally licensed hydro-electric projects, 16 U.S.C. § 821 permits states to regulate the appropriation of water for irrigation or municipal purposes. Thus, because a federal license was issued for the operation of the Toledo Bend Project, Associated contends that federal preemption extends to any regulations pertaining to the engineering, economic, and financial aspects for the Toledo Bend Project. Associated further argues the state's only authority with regard to the Toledo Bend Project is limited to regulations relating to property rights, which it insists are not implicated here because Plaintiffs are not making any property damage claims.

Plaintiffs counter that their claims are not barred by federal preemption. They argue the application of Louisiana's personal injury laws have nothing to do with the engineering, economic, or financial aspects of the Toledo Bend Project, noting specifically that Associated has been unable to cite any cases holding that a state's personal injury laws are preempted by the FPA.

With regard to the issue of preemption, this Court, in *Badon v. R.J. Reynolds Tobacco Co.*, 05-1048, pp. 7-8 (La.App. 3 Cir. 7/12/06), 934 So.2d 927, 933, stated:

> Pursuant to the Supremacy Clause of Article VI of the United States Constitution, state law may be preempted by federal provisions if Congress has either enacted a clear expression of that intent or it has legislated so comprehensively in a field that it has left no room for state regulation. *Epoch Wellsite Servs. v. Ortego*, 03-547 (La.App. 3 Cir. 11/5/03), 858 So.2d 827 (citing *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984)), *writ denied*, 03-3348 (La.2/13/04), 867 So.2d 693. Additionally, preemption will be found when it is impossible to comply with both the federal and state provisions or when application of state law stands as an obstacle to the accomplishment and execution of Congress's full objectives and purposes. *Id.*

We also held in *Epoch Wellsite Servs. v. Ortego*, 03-547, p. 2 (La.App. 3 Cir. 11/5/03), 858 So.2d 827, 829, *writ denied*, 03-3348 (La.2/13/04), 867 So.2d 693, that "there is a strong presumption against federal preemption."

5

Although the FPA authorizes the FERC to regulate and issue licenses for hydropower facilities in navigable waters, that alone is not sufficient to support a finding that Plaintiffs' wrongful death and survival claims are preempted by the FPA. The courts have held "[f]ederal law will override state law under the Supremacy Clause when (1) Congress expressly preempts state law; (2) Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes." *Frank v. Delta Airlines Inc.*, 314 F.3d 195, 197 (5th Cir. 2002) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79, 110 S.Ct. 2270, 2275 (1990)); *see also Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 675 F.3d 802 (5th Cir. 2012).

After a review of the record, we find the trial court did not err in denying Associated's motion for summary judgment because questions of fact existed whether the factors necessary for total federal preemption are present in this case.

For conflict preemption to apply, compliance with both the federal and state provisions must be impossible or the state law must serve to impede federal objectives. We are not convinced from the present record that any conflict exists between state tort laws and the FPA or that state law hinders any congressional objectives. While Associated notes that 16 U.S.C. § 803(c) specifically provides for property damage claims arising out of the operation of a federally licensed hydro-electric project, Plaintiffs are not seeking property damages. Associated also directs our attention to *Simmons v. Sabine River Authority*, No. 2:10 CV 1846, slip op. (W.D. La. 4/26/12). In *Simmons*, the United States District Court for the Western District of Louisiana found plaintiffs' claims for property damage resulting from the release of flood waters from the dam in 2009 *was preempted*.[1]

---

[1] The parties in the instant case and the parties in the *Simmons v. Sabine River Authority* case are not related.

6

Associated has not established that Congress has expressed a similar intent to preempt state tort law.

The more troublesome question here is whether field preemption exists in this case, i.e., does the scope of the FPA "manifest[s] the intention to occupy the entire field of regulating" hydro-electric projects. *Napier v. Atl. Coast Line R.R. Co.*, 272 U.S. 605, 611, 47 S.Ct. 207, 209 (1926). Field preemption exists when Congress "has legislated so comprehensively in a field that it has left no room for state regulation." *Badon*, 934 So.2d at 933 (citations omitted). Associated argues field preemption applies here because the FPA evidences a legislative intent to preempt the field of hydro-electric power insofar as state laws pertain to the "engineering, economic, and financial aspects" of the Toledo Bend Project. Plaintiffs counter it is absurd to suggest that Congress intended to preempt all state law personal injury claims by authorizing FERC to issue a license to the Toledo Bend Dam. Plaintiffs also argue the assertion that Congress intended a broad "field preemption" to apply to the FPA are not supported by the jurisprudence. They point this court to the case of *Hendricks v. Dynegy Power Marketing, Inc.*, 160 F.Supp.2d 1155, 1156-57 (S.D. Cal. 2001), wherein the court was called upon to interpret whether Congress intended the FPA to entirely occupy the field of energy production:

> On its face, Plaintiffs' complaint alleges only violations of state law. The Court concludes that *Congress did not intend for the federal government to entirely occupy the field with the Federal Power Act, thereby completely preempting Plaintiffs' state law claims and converting them into federal questions*. Further, although Plaintiffs' claims might conceivably be cast in federal terms, a plaintiff is the master of his or her own claims; the Court need not recast Plaintiffs' state causes of action into federal causes because Plaintiffs' claims can all be resolved with reference to or resolution of substantial federal questions or issues.

(Emphasis added.)

7

Associated has cited no provision of the FPA or the operating license issued to the SRA that speaks to personal injury actions. Further, Plaintiffs point to several provisions in the power sales agreement entered into between the SRA and FERC which delineate the considerable power granted the SRA in operating the dam. Article V of the agreement provides, "The Authorities shall have the right to operate the reservoir . . . to control properly the flow of the Sabine River for the purposes of performing the Authorities' statutory functions." One of the statutory functions is set forth in La.R.S. 38:2325(10)(c), which provides the SRA shall have the power to control the waters of the Sabine River "for the prevention of devastation of lands from recurrent overflow and the protection of life and property in such district from uncontrolled flood waters."

The action taken by the SRA, the release of water from the floodgate, arguably was not made with any concern for the "development, transmission, and utilization of power across, along, from, or in" Toledo Bend Lake, which Section 4(e) of the FPA described is the purpose of FERC's issuing licenses for hydro-electric projects. It reasonably can be argued this decision more so comports with the mandate of La.R.S. 38:2325(10)(c), i.e., that the SRA control the waters of the Sabine River "for the prevention of devastation of lands from recurrent overflow and the *protection of life* and property in such district from uncontrolled flood waters." (Emphasis added.) At a bare minimum, there are questions of fact as to whether the decision in this instance, to open the dam and release the floodwater, is governed by the SRA's statutory obligations under state law or fall exclusively within the regulations of FERC pursuant to the FPA.

Shortly after oral argument in this matter, Associated filed a supplemental brief with this court directing our attention to a recent decision by the United States Supreme Court, *Kurns v. Railroad Friction*, 132 S.Ct. 1261 (2012), wherein the Court found state law claims for defective design and failure to warn fell within the

8

locomotive equipment regulation preempted by the Locomotive Inspection Act (LIA), as that field was defined by *Napier*. Associated maintains this case definitively holds that field preemption applies to state tort claims in *all areas* regulated by federal statute. An examination of the *Kurns* opinion indicates it stops far short of Associated's contention, and its holding is more properly limited to a *single statute addressing locomotive safety*. In *Kurns*, the court's decision was based on its earlier ruling in *Napier*, which specifically involved the LIA (or in that case, its predecessor the BIA, Boiler Inspection Act).[2] We note Justice Kagan's concurring opinion in *Kurns* cast "doubt [that the] Court would decide *Napier* [ ] in the same way today" and that "[v]iewed through the lens of modern preemption law, *Napier* is an anachronism." *Id*. at 1270. Particularly relevant here is Justice Kagan's comment that under more recent jurisprudence, "Congress must do much more to oust all of state law from a field. See, e.g., *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507 (1973) (rejecting preemption even though Congress had enacted a 'detailed' and 'comprehensive' regulatory scheme)." *Id*.

Justice Sotomayor, concurring in part and dissenting in part (and joined by two other justices), also believed "the Court might decide *Napier* differently today." *Id*. at 1271. She noted the LIA's lack of an express preemption clause, and noted "our recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it." *Id*., (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 617, 117 S.Ct. 1590, 1618 (1997) (Thomas, J., dissenting).

---

[2] In 1915, Congress enacted the LIA to expand the coverage of the BIA of 1911, which prohibited railroads from using a steam locomotive unless its boiler and parts were in "proper condition and safe to operate." The LIA expanded the BIA's coverage to the "entire locomotive and all parts and appurtenances thereof." To ensure compliance, the statute required that locomotives be inspected by the Interstate Commerce Commission (now the Department of Transportation).

9

Here there are no similar decisions involving the FPA and its grant of authority to FERC to regulate the operation of hydro-electric projects. The law therefore, to us, is not as clear as that present in *Kurns*, which the majority therein found was controlled by the 85-year old holding in *Napier* which specifically involved the field of locomotive safety.[3] When that factor is added to the clear presumption that exists *against* preemption, we find the decision in *Kurns* is not on all fours with the present case and does not mandate the granting of Associated's motion for summary judgment as a matter of law.

Associated also argues, in the alternative, that even if Louisiana law applies to this case, Plaintiffs' claims should still be dismissed because Associated's insured, the SRA, did not breach a duty owed to Plaintiffs. Associated argues, quoting *Pitre v. Louisiana Tech University*, 95-1466, p. 11 (La. 5/10/96), 673 So.2d 585, 591, *cert. denied*, 519 U.S. 1007, 117 S.Ct. 509 (1996) (citations omitted), "[i]f the facts of a particular case show that the complained of condition should be obvious to all, the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff." Associated contends the SRA owed no duty to Kyle and Christopher Simmons because the dangerous condition caused by the flooding was obvious.

Even if the condition presented by the floodwater was considered an obvious danger, it does not preclude recovery on Plaintiffs' part. In *Socorro v. City of New Orleans*, 579 So.2d 931, 941 (La.1991), our supreme court noted a defendant's "duty [is] separate and apart from any knowledge the plaintiff had or should have

---

[3] Although Congress did not express an intent to preempt more stringent state safety regulations for locomotive workers in either the BIA or LIA, the *Napier* court found the intent to preempt was implied by the statute's overall purpose. However, considering the clear intent of the BIA/LIA was to protect locomotive workers, it is difficult to rationalize how preempting more stringent safety regulations advances that intent. It is ironic that the result of the *Kurns* holding, in practical effect, means that a statute enacted approximately 100 years ago by Congress to protect locomotive workers from potentially dangerous equipment now serves to protect the manufacture of that equipment from liability should these workers suffer injury as a result of that equipment. Although Associated relies heavily on the holding in *Kurns*, Plaintiffs could reasonably argue that case is an anachronism in the law which more recent minds may not follow in finding field preemption in other federal regulatory schemes.

had of the danger he was encountering." Instead, "the plaintiff's knowledge and conduct is considered only to determine the extent of his comparative negligence." *Id.*

In any event, a motion for summary judgment is inappropriate to dismiss a negligence action when questions of fact exist regarding the duties owed and any breach of the same. "Questions of negligence are generally inappropriate for disposition by summary judgment." *Cobb v. Delta Exports, Inc.*, 03-33, p. 4 (La.App. 3 Cir. 6/4/03), 847 So.2d 739, 742, *writs denied*, 03-1906, 03-1936 (La. 10/31/03), 857 So.2d 483, 485.

## DECREE

For the foregoing reasons, the writ application is denied.

**WRIT DENIED.**

11

NUMBER 11-1146

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

JEANNIE HURST SIMMONS, ET AL.

VERSUS

SABINE RIVER AUTHORITY OF LOUISIANA, ET AL.

AMY, J., dissenting.

I respectfully dissent from the majority decision as I find that, largely, the plaintiffs' petition is preempted by federal law. While the plaintiffs focus here on the personal injury aspect of their suit, it is clear that the plaintiffs' petition alleged that the Sabine River Authority's purported fault in the accident stems from its operation of its facilities, namely, "opening the flood gates of the Dam on March 1, 2001 to such a degree to foreseeably create catastrophic flooding of the lands, homes, and businesses of downstream residents." The plaintiffs also alleged that the SRA failed to: "adopt and/or implement appropriate policies and procedures for the operation of the flood gates of the Dam and the power generation facility at the Dam that would effectively avoid the creation of catastrophic flooding"; maintain an adequate detention capacity in the Reservoir to store excess rainfall; forecast rainfall; and thereafter timely obtain and utilize data related to that rainfall; maintain sufficient outflow capacity of the lower Sabine River; and that it failed to pre-release water from the Toledo Bend Reservoir. Each of these claims focus on the SRA's operations.

In light of these allegations, I think it is significant that the SRA operated under operational and reservoir level guidelines approved by the FERC. As the United States Supreme Court noted in *California v. FERC*, 495 U.S. 490, 496, 110

S.Ct. 2024, 2028 (1990), "Congress clearly intended a broad federal role in the development and licensing of hydroelectric power" through the Federal Power Act. *See also First Iowa Hydro-Elec, Coop. v. Fed. Power Comm'n*, 328 U.S. 152, 66 S.Ct. 906 (1946). However, the Court further noted that the FPA did not provide for the extent to which it intended to preempt concurrent state regulation of matters affecting federally licensed hydroelectric projects. *California v. FERC*, 110 S.Ct. 2024.

Reference to the jurisprudence indicates that much of the debate surrounding the extent of the preemption provided by the FPA focuses upon 16 U.S.C. § 821, which provides:

> Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

In initially interpreting this provision, the Supreme Court, in *First Iowa*, 66 S.Ct. at 917, stated:

> The effect of [16 U.S.C. § 821] in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase 'any vested right acquired therein' further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope unless it be the words 'other uses.' Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes.

Applying this provision to the matter before it, the Supreme Court concluded that a federally licensed hydroelectric project could not be required to obtain a state license related thereto. *Id.* Such a licensure, the Supreme Court remarked, would be at odds with the comprehensive planning authority conveyed by the FPA. *Id.*

The Supreme Court revisited the issue in *California v. FERC*, 110 S.Ct. 2024, concluding that 16 U.S.C. § 821, as interpreted in *First Iowa*, did not allow a state to regulate the minimum flow requirements of a federally-licensed

2

hydroelectric project. It explained that allowing a state to require a flow rate in competition with that prescribed by the federal requirement, "would disturb and conflict with the balance embodied in that considered federal agency determination." *Id.* at 2034. To that extent, permitting the state to impose varying requirements "would be contrary to congressional intent regarding the Commission's licensing authority and would 'constitute a veto of the project that was approved and licensed by FERC.'" *Id.*

Under the facts of this case, it is clear that the Toledo Bend Project (of which the SRA dam project is part) is federally licensed. This was confirmed by the deposition testimony of Linda Curtis-Sparks, former Executive Director of the SRA. She explained that it was constructed for "water conservation, power generation, and recreation" and that the emphasis of "economic development" was later added. She denied that the dam's purpose was flood control.

Additionally, it is clear that the SRA operated the dam and controlled the reservoir under the dictate of FERC-approved guidelines. The plaintiffs do not argue that the SRA failed to comply with those guidelines and did not present evidence in this regard. Further, the submissions include a 2003 FERC Ruling by which the FERC denied a request by a residents' organization, the Sabine River Action Coalition, to alter the minimum reservoir operating level for the Toledo Bend Project in the event of future rainfall events. That Ruling provides, in part, that:

> Our evaluation of the operation of the Toledo Bend Dam during flood-flow events determined that the severity of the flooding is dependent upon many factors, including the duration of the storm, amount of rainfall, the path of the storm, and the saturation level of the basin during the flood event. The Toledo Bend Dam was not designed as a flood control dam. Review of historical flood-flow data indicates that the construction and operation of the Toledo Bend Dam has not increased the incidence of downstream flooding. In some flood events, the dam has been beneficial by delaying the flood flows by temporarily storing a portion of the flood inflow in the reservoir. The ability of the project to pre-release flow to obtain significant reservoir storage in anticipation of high inflows is severely

limited by the downstream development, particularly Deweyville, Texas. Therefore, to obtain flood control benefits, operation of the project would need to be changed to permanently lower the project reservoir level to provide flood control storage. Significantly lowering the reservoir to the extent necessary to provide appreciable flood control benefits would adversely impact the established reservoir recreation activities and power development.

The FERC also denied a rehearing from that ruling.

The United States District Court for the Western District of Louisiana recently considered *Jeff Simmons v. Sabine River Auth. of La.*, 2:10-DV-1846 (W.D. La. filed Apr. 26, 2012), wherein the plaintiffs sought property damages due to flooding as well as an injunction to alter the operational requirements now at issue. Citing the 2003 FERC Ruling in which it declined to alter the guidelines, the district court explained that the plaintiffs' "claims for injunctive relief effectively amount to attempts to use state tort law to have this court mandate the changes FERC denied." *Id*. It similarly rejected the plaintiffs' monetary claims insofar as "the FPA cannot reasonably be interpreted to preserve state law claims for damages arising out of conduct which FERC has expressly declined to prohibit." *Id.*

Like the claim presented in *Jeff Simmons*, I find that the plaintiffs in this case essentially question the SRA's operation of its flood gates in compliance with the federally-approved policies and procedures. Here, they contend that the SRA was negligent under state tort law by failing to abide by standards other than those prescribed by the FERC, *i.e.*, differing state standards presumably required by state negligence standards or the demands of La.R.S. 38:2325. Inherent in the plaintiffs' argument is the premise that those standards vary from those federally-approved policies and procedures at issue. As noted in *Jeff Simmons*, the FERC has specifically declined to adopt those requests. Therefore, I conclude that application of state tort law, in this context and to the extent it would impose

4

differing standards, is preempted by the reasoning expressed in both *First Iowa* and *California v. FERC.*

Additionally, and although the plaintiffs chiefly question the policies and procedures followed by the SRA in this flooding event, they also asserted general negligence and, in particular, contended in their petition that the SRA should have provided transportation for those affected by the flooding event. In this regard, I find that the plaintiffs' claims fall on an evidentiary basis.

It is clear that the plaintiffs would bear the burden of proof on these assorted and general negligence claims at trial. According to La.Code Civ.P. art. 966(C)(2), the relator, as the nonmoving party, was only required to point out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, as the non-moving party, the plaintiffs were required to produce factual support sufficient to establish that they will be able to satisfy their evidentiary burden of proof at trial.

Here, the relator points out that the plaintiffs have not supported their claims of negligence with a factual basis. Even when considered collectively, the parties' submissions in this case do not reveal that the plaintiffs will be able to sustain their burden of proving their negligence claims at trial. Although the plaintiffs *alleged* that the SRA was obligated to provide alternate transportation for the children affected by the flood, they have not directed the court to any law requiring it to do so. Neither have they presented testimony indicating that such a plan, to be executed by the SRA, was customary, feasible, or reasonable given the flooded conditions. Similarly, they have not put forth evidence demonstrating in what way the SRA failed to adequately inform the residents of the hazards associated with the flooded river. The evidence indicates that these property owners knew of the likelihood of the flood, were aware of the rising waters, evacuated, and returned to

5

their flooded property. The family members who testified acknowledged the dangers associated with attempts to navigate the swollen waterway.

In the end, the plaintiffs have only made various allegations of negligence, but have not produced any evidence in support of those claims. Therefore, in my opinion, La.Code Civ.P. art. 966(B) requires that summary judgment should have been entered as to any non-preempted claims.

For these reasons, I would grant the writ application.