AMY, J.,
dissenting.
hi respectfully dissent from the majority decision as I find that, largely, the plaintiffs’ petition is preempted by federal law. While the plaintiffs focus here on the personal injury aspect of their suit, it is clear that the plaintiffs’ petition alleged that the Sabine River Authority’s purported fault in the accident stems from its operation of its facilities, namely, “opening the flood gates of the Dam on March 1, 2001 to such a degree to foreseeably create catastrophic flooding of the lands, homes, and businesses of downstream residents.” The plaintiffs also alleged that the SRA failed to: “adopt and/or implement appropriate policies and procedures for the operation of the flood gates of the Dam and the power generation facility at the Dam that would effectively avoid the creation of catastrophic flooding”; maintain an adequate detention capacity in the Reservoir to store excess rainfall; forecast rainfall; and thereafter timely obtain and utilize data related to that rainfall; maintain sufficient outflow capacity of the lower Sabine River; and that it failed to pre-release water from the Toledo Bend Reservoir. Each of these claims focus on the SRA’s operations.
In light of these allegations, I think it is significant that the SRA operated under operational and reservoir level guidelines approved by the FERC. As the United States Supreme Court noted in California v. FERC, 495 U.S. 490, 496, 110 S.Ct. 2024, 2028, 109 L.Ed.2d 474 (1990), “Congress clearly intended a broad federal role in the development and licensing of hydroelectric power” through the Federal Power Act. See also First Iowa Hydro-Elec. Coop. v. Fed. Power Comm’n, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946). However, the Court further noted that the FPA did not provide for the extent to which it intended to preempt concurrent state regulation of matters affecting federally licensed hydroelectric projects. California v. FERC, 495 U.S. 490, 110 S.Ct. 2024,109 L.Ed.2d 474.
Reference to the jurisprudence indicates that much of the debate surrounding the extent of the preemption provided by the FPA focuses upon 16 U.S.C. § 821, which provides:
Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws, of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.
In initially interpreting this provision, the Supreme Court, in First Iowa, 66 S.Ct. at 917, stated:
The effect of [16 U.S.C. § 821] in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses *1184 of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase ‘any vested right acquired therein’ further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope unless it be the words ‘other uses.’ Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes.
Applying this provision to the matter before it, the Supreme Court concluded that a federally licensed hydroelectric project could not be required to obtain a state license related thereto. Id. Such a licen-sure, the Supreme Court remarked, would be at odds with the comprehensive planning authority conveyed by the FPA. Id.
The Supreme Court revisited the issue in California v. FERC, 110 S.Ct. 2024, concluding that 16 U.S.C. § 821, as interpreted in First Iowa, did not allow a state to regulate the minimum flow requirements of a federally-licensed 1 .^hydroelectric project. It explained that allowing a state to require a flow rate in competition with that prescribed by the federal requirement, “would disturb and conflict with the balance embodied in that considered federal agency determination.” Id. at 2034. To that extent, permitting the state to impose varying requirements “would be contrary to congressional intent regarding the Commission’s licensing authority and would ‘constitute a veto of the project that was approved and licensed by FERC.’” Id.
Under the facts of this case, it is clear that the Toledo Bend Project (of which the SRA dam project is part) is federally licensed. This was confirmed by the deposition testimony of Linda Curtis-Sparks, former Executive Director of the SRA. She explained that it was constructed for “water conservation, power generation, and recreation” and that the emphasis of “economic development” was later added. She denied that the dam’s purpose was flood control.
Additionally, it is clear that the SRA operated the dam and controlled the reservoir under the dictate of FERC-approved guidelines. The plaintiffs do not argue that the SRA failed to comply with those guidelines and did not present evidence in this regard. Further, the submissions include a 2003 FERC Ruling by which the FERC denied a request by a residents’ organization, the Sabine River Action Coalition, to alter the minimum reservoir operating level for the Toledo Bend Project in the event of future rainfall events. That Ruling provides, in part, that:
Our evaluation of the operation of the Toledo Bend Dam during flood-flow events determined that the severity of the flooding is dependent upon many factors, including the duration of the storm, amount of rainfall, the path of the storm, and the saturation level of the basin during the flood event. The Toledo Bend Dam was not designed as a flood control dam. Review of historical flood-flow data indicates that the construction and operation of the Toledo Bend Dam has not increased the incidence of downstream flooding. In some flood events, the dam has been beneficial by delaying the flood flows by temporarily storing a portion of the flood inflow in the reservoir. The ability of the project to pre-release flow to obtain significant reservoir storage in anticipation of high inflows is severely |4limited by the downstream development, particularly Deweyville, Texas. Therefore, to obtain flood control benefits, operation of the project would need to be changed to permanently lower the project reservoir level to provide flood control stor *1185 age. Significantly lowering the reservoir to the extent necessary to provide appreciable flood control benefits would adversely impact the established reservoir recreation activities and power development.
The FERC also denied a rehearing from that ruling.
The United States District Court for the Western District of Louisiana recently considered Jeff Simmons v. Sabine River Auth. of La., 2:10-DV-1846, 2012 WL 1458088 (W.D. La. filed Apr. 26, 2012), wherein the plaintiffs sought property damages due to flooding as well as an injunction to alter the operational requirements now at issue. Citing the 2003 FERC Ruling in which it declined to alter the guidelines, the district court explained that the plaintiffs’ “claims for injunctive relief effectively amount to attempts to use state tort law to have this court mandate the changes FERC denied.” Id. It similarly rejected the plaintiffs’ monetary claims insofar as “the FPA cannot reasonably be interpreted to preserve state law claims for damages arising out of conduct which FERC has expressly declined to prohibit.” Id.
Like the claim presented in Jeff Simmons, I find that the plaintiffs in this case essentially question the SRA’s operation of its flood gates in compliance with the federally-approved policies and procedures. Here, they contend that the SRA was negligent under state tort law by failing to abide by standards other than those prescribed by the FERC, i.e., differing state standards presumably required by state negligence standards or the demands of La.R.S. 38:2325. Inherent in the plaintiffs’ argument is the premise that those standards vary from those federally-approved policies and procedures at issue. As noted in Jeff Simmons, the FERC has specifically declined to adopt those requests. Therefore, I conclude that application of state tort law, in this context and to the extent it would impose | .^differing standards, is preempted by the reasoning expressed in both First Iowa and California v. FERC.
Additionally, and although the plaintiffs chiefly question the policies and procedures followed by the SRA in this flooding event, they also asserted general negligence and, in particular, contended in their petition that the SRA should have provided transportation for those affected by the flooding event. In this regard, I find that the plaintiffs’ claims fall on an evidentiary basis.
It is clear that the plaintiffs would bear the burden of proof on these assorted and general negligence claims at trial. According to La.Code Civ.P. art. 966(C)(2), the relator, as the nonmoving party, was only required to point out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, as the non-moving party, the plaintiffs were required to produce factual support sufficient to establish that they will be able to satisfy their evidentiary burden of proof at trial.
Here, the relator points out that the plaintiffs have not supported their claims of negligence with a factual basis. Even when considered collectively, the parties’ submissions in this case do not reveal that the plaintiffs will be able to sustain their burden of proving their negligence claims at trial. Although the plaintiffs alleged that the SRA was obligated to provide alternate transportation for the children affected by the flood, they have not directed the court to any law requiring it to do so. Neither have they presented testimony indicating that such a plan, to be executed by the SRA, was customary, feasible, or reasonable given the flooded conditions. *1186 Similarly, they have not put forth evidence demonstrating in what way the SRA failed to adequately inform the residents of the hazards associated with the flooded river. The evidence indicates that these property owners knew of the likelihood of the flood, were aware of the rising, waters, evacuated, and returned to | f,their flooded property. The family members who testified acknowledged the dangers associated with attempts to navigate the swollen waterway.
In the end, the plaintiffs have only made various allegations of negligence, but have not produced any evidence in support of those claims. Therefore, in my opinion, La.Code Civ.P. art. 966(B) requires that summary judgment should have been entered as to any non-preempted claims.
For these reasons, I would grant the writ application.