[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12584
_____

D.C. Docket No. 6:11-cv-02139-LSC

CHARLES R. OTWELL, SR.,
JUDY OTWELL,
DAVID BILLINGS,
KHFW, LLC,

Plaintiffs-Appellants,

versus

ALABAMA POWER COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 1, 2014)

Before HULL and BLACK, Circuit Judges, and SMITH,[*] District Judge.

BLACK, Circuit Judge:

_____

[*] Honorable C. Lynwood Smith, Jr., United States District Judge for the Northern District of Alabama, sitting by designation.

Charles and Judy Otwell, property owners on Smith Lake in north central Alabama; David Billings, another property owner on Smith Lake; and KHFW, LLC, a real estate development company that owns property on Smith Lake (collectively, Appellants), appeal the district court's grant of summary judgment to Appellee Alabama Power Company (Alabama Power) on their complaint alleging Alabama Power unreasonably lowers the water levels of Smith Lake.[1] We conclude Appellants' claims are an impermissible collateral attack on the agency order authorizing Alabama Power to continue operating the lake and therefore affirm.

## I. BACKGROUND

The district court provided a thorough and cogent review of the history and context of this case in its order granting summary judgment, and the parties do not dispute the essential facts. Accordingly, we provide only a brief overview of the pertinent information.

In 1957, the Federal Power Commission (FPC), the predecessor of the Federal Energy Regulatory Commission (FERC), issued Alabama Power a 50-year license (the 1957 License) to construct, operate, and maintain the Warrior River Project (the Project), which included constructing the Lewis Smith Dam on the Sipsey Fork of the Black Warrior River, creating a 21,200 acre reservoir (i.e.,

---

[1] Appellants also challenge the district court's denial of their cross-motion for partial summary judgment.

Smith Lake), and building hydroelectric power houses. In accordance with the 1957 License, Alabama Power purchased or condemned land and property rights below 510 feet mean sea level (msl) from affected property owners and acquired the right to inundate the lands between 510 and 522 feet msl under certain conditions.

The 1957 License obligated Alabama Power to implement flood control operations pursuant to a manual that Alabama Power would prepare in conjunction with the Army Corps of Engineers. That manual describes the normal operation of Smith Lake, provides procedures to be followed during a flood, and establishes guide curves for the year-round elevation of the lake. The manual explains that Alabama Power would operate the Project as a "peaking plant" to help meet energy demands on the company's system and, in so doing, would normally keep Smith Lake at or below an elevation of 510 feet msl at all times when there was no flooding. It is undisputed, however, that so long as Alabama Power operated the Project to meet the dual requirements of flood control and downstream navigation, it could conduct its operations "to best suit system requirements to obtain maximum energy generation from water available and did not have to maintain specified lake elevations."

In 1974, Alabama Power began coordinating its operation of Smith Lake with the Gorgas Steam Plant (Plant Gorgas), which is located approximately 44

3

miles downstream from the dam.  As part of the coordination procedure, Alabama Power releases cold water from Smith Dam for Plant Gorgas to use in once-through cooling—a process that allows the plant to meet regulatory requirements for the temperature of discharges back into the river.  Such coordination ordinarily requires water to be released from the dam five days per week for five or six hours per day from May through October.

In 2000, Alabama Power began the process of relicensing the Project and, after consulting with numerous stakeholders, filed a renewal application with the FERC in July 2005.  The application provided that Alabama Power would continue to operate the Project as a peaking plant and that no changes in the guide curve or schedule for flood control operations were needed.

In 2007, while Alabama Power's application was pending with the FERC, the Smith Lake Improvement and Stakeholders Association (SLISA) intervened in the relicensing proceedings.  SLISA is "a non-profit organization representing more than 3,000 property owners and other interested parties in and around Smith Lake."  Jared Key—a former plaintiff in this case and one of the owners of KHFW—is the president of SLISA.  SLISA, as well as appellant David Billings, actively participated in the relicensing proceedings and opposed Alabama Power's request to continue operating the Project as it had under the 1957 License.  SLISA specifically proposed that the elevation of Smith Lake be kept higher and more

4

stable throughout the year and suggested that the FERC require Alabama Power to construct cooling towers at Plant Gorgas (rather than allow the company to use once-through cooling) to minimize the releases of water from Smith Dam.

In March 2009, the FERC issued a "Final Environmental Assessment" in which it discussed SLISA's proposal for more stable lake levels at length and concluded that "the costs of [SLISA's] alternative outweigh the benefits, and it is not in the overall public interest to adopt this measure." On March 31, 2010, the FERC issued Alabama Power a 30-year license to continue operating the Project (the 2010 License). In the 2010 License, the FERC stated it had considered and rejected SLISA's proposal for more stable lake levels and approved Alabama Power's plan for operating the Project "because it provide[d] for the comprehensive use of multiple competing resources within the Warrior River and downstream river basins." SLISA filed a petition for rehearing.

On May 11, 2011, while SLISA's petition for rehearing was pending with the FERC, Appellants filed a putative class action against Alabama Power in the Circuit Court of Walker County, Alabama.[2] In their complaint, Appellants alleged

---

[2] Jared Key was also a plaintiff in the initial suit, but he and his claims were later voluntarily dismissed from the case.

Alabama Power unreasonably decreased lake levels during certain months of the year to such an extent that they could not enjoy their property or the lake.[3]

After Alabama Power removed the case to federal district court, the FERC denied SLISA's request for rehearing, reiterating that SLISA's proposal for more stable lake levels was not in the overall public interest. After amending their complaint several times, Appellants ultimately asserted numerous state tort claims against Alabama Power related to its allegedly unreasonable actions in lowering the levels of Smith Lake. In the operative version of their complaint, Appellants requested, *inter alia*, monetary damages, a declaratory judgment finding they had riparian rights in the lake, and an injunction requiring Alabama Power to construct cooling towers at Plant Gorgas.

Alabama Power filed a motion for summary judgment on all of the Appellants' claims, and Appellants filed a cross-motion for partial summary judgment on their claim seeking a declaratory judgment that they possessed riparian rights in Smith Lake. In a meticulous and particularly thoughtful order, Judge Coogler granted Alabama Power's motion for summary judgment and denied Appellants' cross-motion, finding in pertinent part that Appellants' claims were an impermissible collateral attack on the FERC's 2010 relicensing order and,

---

[3] The plaintiffs also alleged that Alabama Power improperly stored water on their property between 510 and 522 feet msl during certain months of the year. The claims arising from those allegations were voluntarily dismissed and are not part of this appeal.

even if they were not, Alabama Power's operation of the Project was reasonable under Alabama law.  This appeal followed.

## II. STANDARD OF REVIEW

We review *de novo* a district court's resolution of a motion for summary judgment as well as "threshold justiciability determinations."  *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006).  In reviewing a grant of summary judgment, we view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party.  *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013).  We review the district court's denial of declaratory relief for abuse of discretion.  *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1251 (11th Cir. 2008).

## III. DISCUSSION

We begin our analysis with a brief discussion of federal jurisdiction and the constitutional standing requirements of Article III.  After concluding Appellants have alleged a cognizable injury in fact, we address their contention that the district court abused its discretion by declining to issue a declaratory judgment finding that they possess riparian rights in Smith Lake.  Finding no abuse of discretion in the district court's refusal to grant declaratory relief, we address the district court's grant of summary judgment to Alabama Power and hold that

Appellants' claims are inescapably intertwined with a review of the 2010 License and constitute an impermissible collateral attack on the FERC's final order.

## A. Standing

Appellants argue the district court abused its discretion by declining to decide whether they have riparian rights in the waters of Smith Lake. They contend the district court should have addressed whether they have riparian rights in order to assure itself of its jurisdiction to resolve this case. According to Appellants, if they do not possess riparian rights in the lake, then they do not have standing to assert their claims. Because "we have an obligation to assure ourselves of a litigant's standing under Article III," we consider Appellants standing arguments before addressing the propriety of the district court's grant of summary judgment. *Ouachita Watch League*, 463 F.3d at 1169.

The doctrine of standing does not support Appellants' arguments. Article III of the Constitution limits the power of the federal courts to resolving cases and controversies. U.S. Const. art. III, § 2. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008) (quotation marks omitted). To satisfy Article III's standing requirements, a plaintiff must show (1) he has suffered an injury in fact that is concrete and particularized as well as actual or imminent, (2) the injury is traceable to the defendant, and (3) it is likely the injury will be

8

redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 704 (2000).

Regardless of whether Appellants have riparian rights in Smith Lake, the alleged harm to their recreational interests in the lake is a concrete and particularized injury in fact that gives them Article III standing. *See Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005) ("In an environmental case, an individual plaintiff may show . . . injury in fact[] by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed").[4] Appellants have alleged a concrete and particularized injury in fact to their recreational interests, *see Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242-43 (11th Cir. 2003), that injury is traceable to Alabama Power, and that injury would likely be redressed by a favorable decision. Accordingly, Appellants meet the

---

[4] Appellants' standing is entirely independent of whether they actually have riparian rights in Smith Lake. It is immaterial that the specific claims Appellants chose to pursue would fail in the absence of riparian rights because the district court's jurisdiction to resolve cases and controversies does not hinge on the ultimate success or failure of a plaintiff's claims. *See Swann v. Sec'y of Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012) ("We have held that standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." (quotation marks and brackets omitted)); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11th Cir. 2005) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal. . . .").

constitutional standing requirements.[5]  *See Friends of the Earth*, 528 U.S. at 180-81, 120 S. Ct. at 704.

## B. Declaratory Relief

Having assured ourselves that Article III's standing requirements have been met, we conclude the district court did not abuse its discretion in declining to issue a declaratory judgment concerning Appellants' purported riparian rights.  It is well established that district courts have exceptionally broad discretion in deciding whether to issue a declaratory judgment, and the remedy is not obligatory.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-88, 115 S. Ct. 2137, 2142-43 (1995).  The Supreme Court has explained that, "[s]ince its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants," and that "[t]he statute's textual commitment to discretion, and the breadth of leeway [the Court has] always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface."  *Id.* at 286-87, 115 S. Ct. at 2142.

---

[5] Our conclusion that the standing requirements of Article III were satisfied in this case does not conflict with our holding that the exclusive review provision of the Federal Power Act (FPA) prevented Appellants from pursuing their claims in the district court.  Although the FPA directs all challenges to the FERC's final orders directly from the agency to this Court, the statute's judicial review mechanism did not negate the fact that Appellants' have alleged a cognizable injury in fact for Article III purposes.

10

As the district court recognized, the question of whether Appellants have riparian rights in Smith Lake is not dispositive of their claims. Even if they have such rights, Alabama Power might not have violated those rights or might otherwise avoid liability for any number of reasons. Appellants did not have a right to a declaratory judgment, and the district court did not abuse its substantial discretion by assuming Appellants had riparian rights and then resolving their claims on an alternative basis. *See Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) ("The Declaratory Judgment Act is an enabling Act, which confers a discretion on courts rather than an absolute right upon the litigant." (quotation marks omitted)); *see also Wilton*, 515 U.S. at 289, 115 S. Ct. at 2144 ("[F]acts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within [the district court's] grasp."). Accordingly, we affirm the district court's denial of Appellants' motion for partial summary judgment.

## C. Collateral Attack

Appellants contend the district court erred by finding their claims were an impermissible collateral attack on the FERC's relicensing order because, rather than challenging the agency's decision, Appellants simply sought to enforce their riparian rights. Appellants also maintain they are distinct parties from SLISA and that they do not seek to vindicate the same interests SLISA pursued before the

11

FERC since they assert different claims and request different relief.  In addition,

Appellants argue that 16 U.S.C. § 821 expressly preserves state common law

property rights and allows them to pursue their claims.

*1. Section 825l(b)*

We agree with the district court that Appellants' claims are a collateral

attack on the FERC's final relicensing determination.  The Federal Power Act

(FPA) contains a judicial review provision which vests the federal courts of

appeals with exclusive jurisdiction to affirm, modify, or set aside an order of the

FERC.  16 U.S.C. § 825*l*(b).  Section 825*l*(b) provides:

> Any party to a proceeding under this chapter aggrieved by an order
> issued by the Commission in such proceeding may obtain a review of
> such order in the United States Court of Appeals for any circuit
> wherein the licensee or public utility to which the order relates is
> located or has its principal place of business, or in the United States
> Court of Appeals for the District of Columbia, by filing in such court,
> within sixty days after the order of the Commission upon the
> application for rehearing, a written petition praying that the order of
> the Commission be modified or set aside in whole or in part. . . . Upon
> the filing of such petition such court shall have jurisdiction, which
> upon the filing of the record with it shall be exclusive, to affirm,
> modify, or set aside such order in whole or in part.

*Id.*

The Supreme Court has explained that, in enacting § 825*l*(b), Congress

"prescribed the specific, complete and exclusive mode for judicial review of the

Commission's orders."  *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320,

336, 78 S. Ct. 1209, 1218 (1958).  Thus, § 825*l*(b) "necessarily preclude[s] de

12

novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review," and requires that "all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all." *Id.* at 336, 78 S. Ct. at 1219.

Appellants cannot escape § 825*l*(b)'s strict judicial review provision by arguing that they are pursuing different claims and different relief than the parties before the FERC. *See id.* (stating § 825*l*(b) encompasses "all issues inhering in the controversy"). Appellants' suit sought more stable water levels in Smith Lake, and Appellants explicitly requested an injunction requiring Alabama Power to construct cooling towers at Plant Gorgas—proposals expressly considered and rejected by the FERC in its relicensing proceedings, in the order issuing the 2010 License, and in its order denying rehearing. Appellants are attempting to obtain the same results and to place the same constraints on Alabama Power rejected by the agency in the exercise of its institutional expertise, and their claims are inescapably intertwined with a review of the FERC's final decision. *See Doe v. FAA*, 432 F.3d 1259, 1263 (11th Cir. 2005) (considering a challenge to a decision of the Federal Aviation Administration and concluding the plaintiff's claims were an impermissible collateral attack on the agency order because they were inescapably intertwined with a review of the procedures and actions taken by the

13

FAA); *see also Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001) (explaining that "statutes . . . that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are 'inescapably intertwined' with review of such orders"). The review entailed by Appellants' claims is statutorily dedicated to the court of appeals, and the district court did not err by concluding it could not resolve the merits of Appellants' suit. *Cf. Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 78 (D.C. Cir. 1984) (explaining that exclusive judicial review provisions implicate compelling considerations, including judicial economy, fairness, and the elimination of duplicative and potentially conflicting review).

Appellants' argument that they are not subject to the exclusive judicial review provision of § 825*l*(b) because they are distinct parties from SLISA and did not participate in the proceedings before the FERC is unavailing. We do not read § 825*l*(b) as allowing any person or entity that was not a party to the FERC proceedings to collaterally challenge the final order resulting from those proceedings. Instead, we read § 825*l*(b) as limiting the persons who may seek judicial review of an order of the FERC to those parties who participated in the FERC proceedings. 16 U.S.C. § 825*l*(b). Thus, non-parties to the proceedings before the FERC may not contest the agency's final decision in an alternative forum by bringing challenges that are inescapably intertwined with a review of the

14

agency's final determination. *Cal. Trout v. FERC*, 572 F.3d 1003, 1013 (9th Cir. 2009) ("Because section [825*l*(b)] enumerates the specific, complete and exclusive mode for judicial review of the Commission's orders, a non-party to the Commission's proceedings may not challenge the Commission's final determination in any court." (quotation marks and citation omitted)).

Our reading of the statute accords with the Supreme Court's statements in *City of Tacoma* that § 825*l*(b) precludes all other modes of judicial review and that all objections to the FERC's order "must be made in the Court of Appeals or not at all." 357 U.S. at 336, 78 S. Ct. at 1219. Our interpretation of § 825*l*(b) also prevents the provision from being rendered nugatory. *See United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1730 (2011). Under Appellants' approach, any person or entity with an interest in the proceedings before the FERC could evade the FPA's exclusive judicial review provision by simply choosing not to participate in the proceedings, or by creating a corporate entity to champion its interests before the agency. Then, following an adverse order, the non-participants could obtain a collateral redetermination of the identical issues considered and rejected in the FERC's final order because those persons were not parties to the proceedings. Such a construction of the statute would do violence to Congress's deliberately crafted administrative scheme and would eviscerate § 825*l*(b).

*2. Section 821*

15

Appellants argue § 821 of the FPA "saves" their state common law rights and allows them to assert their state law claims against Alabama Power. We are unpersuaded.

Section 821 provides that:

[n]othing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

16 U.S.C. § 821. The Supreme Court has stated that the FPA:

discloses both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the nation and a determination to avoid unconstitutional invasion of the jurisdiction of the states. The solution reached is to apply the principle of the division of constitutional powers between the state and Federal Governments.

*First Iowa Hydro-Electric Coop. v. Fed. Power Comm'n*, 328 U.S. 152, 171, 66 S. Ct. 906, 915 (1946). In that context, the Supreme Court explained that § 821 protects state laws from federal preemption but is limited "to laws as to the control, appropriation, use or distribution of water in irrigation or for municipal or other uses of the same nature." *Id.* at 175-76, 66 S. Ct. at 917. The Court emphasized that the words "other uses" are "confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes." *Id.* at 176, 66 S. Ct. at 917.

16

More recently, in *California v. FERC*, 495 U.S. 490, 499, 110 S. Ct. 2024, 2030 (1990), the Supreme Court adhered to a narrow construction of § 821 and emphasized that the FPA "establishes a broad and paramount federal regulatory role." In *California*, the state of California and the federal government both sought to regulate the amount of water a FERC-licensed power plant had to maintain in a specific section of a stream. *Id.* at 493-94, 110 S. Ct. at 2027. In concluding that the power plant was subject to the minimum flow rates established by the FERC rather than the state, the Supreme Court reaffirmed the validity of *First Iowa* and reiterated that § 821 is limited to proprietary rights "of the same nature as those relating to the use of water in irrigation or for municipal purposes." *Id.* at 497-98, 110 S. Ct. at 2029 (quotation omitted). The Court explained that "California's minimum stream flow requirements neither reflect nor establish 'proprietary rights,' or 'rights of the same nature as those relating to the use of water in irrigation or for municipal purposes.'" *Id.* at 498, 110 S. Ct. at 2029 (quoting *First Iowa*, 328 U.S. at 176, 66 S. Ct. at 917). The Supreme Court also concluded that *First Iowa*'s interpretation of § 821 was not dicta. *Id.* at 500-02, 110 S. Ct. at 2030-31.

Appellants' purported rights in Smith Lake relate to their recreational use of the lake. Those alleged rights are not similar in nature to rights relating to irrigation and municipal uses and therefore do not fall within the scope of § 821, as

17

interpreted by the Supreme Court. Appellants attempt to distinguish *First Iowa* and *California* from the present case by asserting this case involves discretionary conduct while *First Iowa* and *California* involved mandatory state regulations. The discretion granted to Alabama Power under its FERC license, however, is completely unrelated to the type of rights that fall within the ambit of § 821. Appellants' purported rights to the recreational use of Smith Lake would not relate to irrigation or municipal uses even if the guide curve were mandatory or if Alabama Power had no discretion regarding the operation of the Project. Section 821 does not allow Appellants to veto the operation of a project that was approved and licensed by the FERC, *see California*, 495 U.S. at 506-07, 110 S. Ct. at 2034, and the district court's grant of summary judgment to Alabama Power is affirmed.[6]

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment denying Appellants' motion for partial summary judgment and granting summary judgment to Alabama Power.

**AFFIRMED.**

---

[6] Because we conclude Appellants could not pursue their claims directly in the district court, we need not address the district court's alternative finding that Alabama Power's operation of the Project was reasonable under state law.