**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2898
_____

ADORERS OF THE BLOOD OF CHRIST UNITED
STATES PROVINCE,
n/k/a Adorers of the Blood of Christ, United States Region,
Successor by Merger to Adorers of the Blood of Christ,
Province of Columbia, PA, Inc. formerly known as
Saint Joseph Convent Motherhouse of the Adorers of the
Blood of Christ,
Columbia, Pennsylvania, Inc. formerly known as Saint
Joseph's Convent,
Mother House of Sister Adorers of the Most Precious
Blood, Columbia, PA
also known as Sisters Adorers of the Most Precious Blood,
St. Joseph Convent, Columbia, PA;
SISTER SARA DWYER;
SISTER MARIA HUGHES;
SISTER DANI BROUGHT;
SISTER MARY ALAN WURTH;
SISTER THERESE MARIE SMITH,
Appellants

v.

TRANSCONTINENTAL GAS PIPE LINE CO LLC

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No.: 5-20-cv-05627)
District Judge: Honorable Jeffrey L. Schmehl
_____

Argued
September 15, 2022

(Filed: November 8, 2022)


 Before:  KRAUSE, BIBAS, and RENDELL, *Circuit Judges*.

J. Dwight Yoder  [**Argued**]
Sheila V. O'Rourke
Gibbel, Kraybill & Hess
2933 Lititz Pike
P.O. Box 5349
Lancaster, PA 17606

Counsel for Appellants

Elizabeth U. Witmer  [**Argued**]
Saul Ewing Arnstein & Lehr
1200 Liberty Ridge Drive
Suite 200
Wayne, PA 19087

Patrick F. Nugent
Sean T. O'Neill
Shane P. Simon
Saul Ewing Arnstein & Lehr

1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

Counsel for Appellee

_____

OPINION OF THE COURT

_____

**RENDELL**, *Circuit Judge*.

This is the second attempt by the Adorers of the Blood of Christ ("Adorers"), a religious group opposed to the extraction, transportation, and use of fossil fuels, to challenge the route, construction, and operation of an interstate gas pipeline on their property as violative of their rights under the Religious Freedom and Restoration Act ("RFRA"). Their first attempt sought an injunction before the pipeline was constructed; this attempt seeks money damages after its completion. In both cases, the District Court dismissed the complaint on the ground that the Adorers' failure to present their claims to the Federal Energy Regulatory Commission ("FERC") at any time during the years-long administrative proceedings, which ultimately authorized the pipeline, foreclosed their claim under the Natural Gas Act's ("NGA") exclusive-review framework. We affirmed the District Court's order in the first action, Adorers of the Blood of Christ v. FERC (Adorers I), 897 F.3d 187 (3d Cir. 2018), and will do so in this case as well.

## I.

As we explained in connection with the Adorers' first case, under the NGA, FERC has the sole authority to issue a "certificate of public convenience and necessity," which permits private gas pipeline developers to build, operate, and maintain new interstate gas pipelines. 15 U.S.C. § 717f(c)(1)(A). To determine whether to issue such a certificate, FERC must consider the public's input, and, to that end, it must provide reasonable notice to various parties who would be affected by the pipeline and provide those parties with an opportunity to be heard. Id. § 717f(c)(1)(B). "If FERC ultimately issues the certificate following the requisite hearing, any aggrieved person may seek judicial review of its decision—either in the Court of Appeals for the District of Columbia Circuit or the circuit wherein the natural gas company is located or has its principal place of business." Adorers I, 897 F.3d at 189 (citing 15 U.S.C. § 717r(b)). Before petitioning an appropriate court of appeals for review of a FERC order, however, the aggrieved party must first seek rehearing before FERC. 15 U.S.C. § 717r(a). Failure to seek rehearing before FERC bars the aggrieved party from later obtaining judicial review. Id.

## II.

The Adorers collectively comprise an order of Roman Catholic nuns whose deeply-held religious beliefs require them "to protect, preserve, and treasure the land that" they own and "to protect and preserve Earth." App. at 18 ¶ 1. They own property in Lancaster County, Pennsylvania, and use and maintain that property in accordance with their religious

4

beliefs, including for agricultural purposes. Among other things, the Adorers believe the extraction, transportation, and use of fossil fuels accelerates global warming and climate change and, thus, defiles God's creation. Any use of their property to facilitate the extraction, transportation, and use of fossil fuels, violates their religious beliefs and practices. So, in 2014, when Transcontinental Gas Pipe Line Company ("Transco") notified the Adorers that it was in the early stages of designing a new 183-mile long, 42-inch diameter interstate gas pipeline, known as the "Central Penn Line South," part of the "Atlantic Sunrise Pipeline," to transport 1.7 million dekatherms of gas through their property each day, the Adorers explained to Transco's right-of-way agent that this would violate their religious beliefs and that they would not entertain any offer by Transco to purchase a right-of-way through their property. Nearly a year later, Transco filed a formal application with FERC to obtain a certificate of public convenience and necessity. See 15 U.S.C. § 717f(c).

FERC then proceeded to publish numerous notices, over the course of more than thirty months, as part of the pipeline approval process and as required under the NGA and FERC regulations. It mailed letters about the project to thousands of parties, solicited comments from the public, and hosted four initial open meetings to discuss, among other things, the proposed route of the pipeline and the effect of the pipeline's construction and operation on various stakeholders. Adorers I, 897 F.3d at 191-92. Although FERC received hundreds of written comments and heard scores of comments and objections from interested parties at its initial meetings, the Adorers neither provided comments to FERC nor did they attend any of those meetings. Id.

5

Even when FERC contacted the Adorers directly, they remained silent. On October 22, 2015, FERC delivered a letter to the Adorers describing various pipeline routes under consideration, including routes that would directly impact their property, and invited them to participate in the environmental review process where the Adorers could comment on the project and request modifications or accommodations, including the rerouting of the pipeline.[1] Id. The Adorers, however, did not respond to the letter, did not participate in the process, and did not otherwise formally oppose the project as it remained under review before FERC. Id.

On February 3, 2017, after receiving still further written comments and oral comments from hundreds of speakers at environmental review hearings, and after Transco altered the pipeline's route at least 132 times in response to public comment—in total changing the original proposed route by about fifty percent—FERC issued a certificate to Transco authorizing it to build, operate, and maintain the pipeline. Transcon. Gas Pipe Line Co., 158 FERC ¶ 61,125, 2017 WL 496024, ¶ 151 (Feb. 3, 2017). The certificate also authorized

---

[1] Indeed, some property owners obtained meaningful relief because of their participation in this process. In response to property owner concerns, FERC attached certain conditions to the issuance of any certificate to Transco including, for example, that Transco agree to "compensate [organic farm] landowners" if their organic farm certifications were impacted by the pipeline, Transcon. Gas Pipe Line Co., 158 FERC ¶ 61,125, 2017 WL 496024, ¶ 101, (Feb. 3, 2017), and that Transco agree to provide "monetary compensation to the occupants of affected noise sensitive areas in the project area," id. ¶ 167.

6

Transco, as provided under the NGA, to use eminent domain to take rights-of-way from any property owners unwilling to sell a right-of-way to Transco voluntarily. Id. ¶ 67; see 15 U.S.C. § 717f(h) (providing that "[w]hen any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line . . . it may acquire the same by the exercise of the right of eminent domain"). While the final pipeline route avoided some properties because of fruitful discussion among the property owners, FERC, and Transco during the certification process, the final pipeline route, not surprisingly, wended through the Adorers' property.

On April 14, 2017, Transco filed a complaint in federal court under Federal Rule of Civil Procedure 71.1 (setting forth the procedure for condemning real property by eminent domain) and § 717f(h) of the NGA seeking an order of condemnation to permit it to take title to rights-of-way in the Adorers' property necessary to build and operate the pipeline. Despite service, the Adorers failed to answer or otherwise respond to the complaint until after Transco filed a motion for default judgment and sought an emergency order from the District Court authorizing it to take immediate possession of the rights-of-way.

Ultimately, the District Court granted default judgment to Transco regarding its substantive entitlement to the rights-of-way but deferred a decision on Plaintiff's request for possession until after an evidentiary hearing.[2]

_____

[2] The District Court later granted full possession of the right-of-way to Transco and awarded "just compensation" to the

7

One week after the District Court granted default judgment to Transco and just three days before the District Court's evidentiary hearing, the Adorers filed a separate suit in the U.S. District Court for the Eastern District of Pennsylvania claiming for the first time in any official filing, that FERC, and Transco—who was later added as a defendant—violated their rights under RFRA. They urged that under RFRA, they had the right to raise a claim or defense for "appropriate relief." See 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."). And they contended that this gave them the right to institute an action in federal court rather than proceed

Adorers but rejected their claim for additional damages, which the Adorers claimed arose from the same purported violation of RFRA at issue in this case. The District Court explained that not only was the Adorers' RFRA claim irrelevant to the question of the fair market value of the right-of-way, but also that it was a counterclaim for compensatory damages beyond the ken of condemnation proceedings under Fed. R. Civ. P. 71.1. Under Fed. R. Civ. P. 71.1, the District Court noted, "[a] defendant waives all objections and defenses not stated in its answer. No other pleading or motion asserting an additional objection or defense is allowed" and "Courts have repeatedly upheld Rule 71.1's limitation on additional pleadings such as counterclaims." App. at 523 (internal quotation marks omitted) (quoting Fed. R. Civ. P. 71.1(e)(3)). As the Adorers failed to answer the condemnation complaint and their claim for additional damages was not cognizable under Fed. R. Civ. P. 71.1, the District Court rejected the claim. The Adorers did not appeal that ruling.

before FERC. The Adorers sought an injunction permanently enjoining Transco from completing its project.

Transco moved to dismiss the Adorers' complaint for lack of subject matter jurisdiction and the District Court granted the motion. The District Court concluded that "RFRA did not allow the Adorers to circumvent the specific procedure prescribed by [Congress under] the NGA for challenging a FERC order" and "[b]ecause the Adorers had failed to seek FERC rehearing . . . it was foreclosed from hearing their claims." Adorers I, 897 F.3d at 193. Adorers appealed and we affirmed the District Court's order. Id. at 198.

In so doing, we rejected the Adorers' contention that RFRA somehow gave them the statutory right to assert their claim in federal district court rather than before FERC. We reasoned that the NGA's "exhaustion provision . . . makes clear Congress' intent to confer exclusive jurisdiction to the NGA by a highly reticulated statute nullifying any procedural alternatives an aggrieved party may otherwise have." Id. at 195. We continued,

> Indeed, the NGA is the exclusive remedy for matters relating to the construction of interstate natural gas pipelines. It forms the paradigm by which FERC operates in matters related to interstate natural gas pipelines. By failing to avail themselves of the protections thereunder, the Adorers have foreclosed judicial review of their substantive RFRA claims.

9

Id.

We also rejected the Adorers' "claim that, even if they had indulged the administrative process, they could not have asserted their rights under RFRA within the NGA because they would have had 'to have anticipated a possible RFRA violation and affirmatively acted to become a party to a private third party's administrative application.'" Id. at 197. In rejecting this claim, we observed that "FERC may hear any claim raised before it—even potential violations of federal law." Id. And if FERC incorrectly adjudicated such a claim, the aggrieved claimant "has the opportunity for direct appeal before a federal court of appeals." Id. Had the Adorers "participated in the administrative process, FERC may have denied or modified the conditions of Transco's certificate . . . . [and] [u]nder these circumstances, the Adorers would have, at the very least, had the opportunity to seek the [injunctive] relief they so desire." Id. at 198.

Soon after the pipeline was completed and put into service, the Adorers filed a new complaint in the District Court. Although, as the District Court noted, this new complaint "[wa]s nearly identical to the previous action filed by the Adorers for [an] alleged RFRA violation[]" the Adorers made three changes. App. at 7. First, the Adorers named only Transco as a defendant. Second, rather than seek injunctive relief as they unsuccessfully attempted to in Adorers I, they sought money damages for the RFRA violation. App. at 41 ¶ 129. Third, the Adorers alleged, somewhat differently from their position in Adorers I, that the source of the substantial burden on their religious exercise arose not from "FERC's decision to force the Adorers to use land they own to accommodate a fossil fuel pipeline," Compl. at 9 ¶ 45, Adorers

10

I, No. 5:17-cv-03163-JLS (E.D. Pa. July 14, 2017), ECF No. 1 (emphasis added), but instead, from "Transco's action in placing the Pipeline in to [sic] service using the Adorers' land," App. at 37 ¶ 111 (emphasis added), thus, suggesting that their claim was not ripe until this occurred.[3]

Transco again moved to dismiss this new complaint for lack of subject matter jurisdiction and the District Court again granted the motion. The District Court, applying our holding in Adorers I, concluded that given Adorers' admission that "they not only failed to apply for a rehearing before FERC but failed to present their RFRA claims in any manner to the FERC, and ultimately [failed] to [appeal their claim to] the appropriate Court of Appeals . . . . the Adorers . . . foreclosed judicial review of their substantive RFRA claims." App. 9, 10 (citation omitted). The District Court rejected the Adorers' argument that "because they are seeking monetary damages . . . as opposed to the injunctive relief they sought in Adorers I . . . and that money damages are not available through FERC's administrative process, this Court has subject matter jurisdiction." App. at 10.

The Adorers filed this timely appeal.

---

[3] Compare Compl. at 2 ¶ 1, Adorers I, No. 5:17-cv-03163-JLS (E.D. Pa. July 14, 2017), ECF No. 1 ("FERC's action in issuing the FERC Order approving and authorizing Transco to forcibly take and use land owned by the Adorers . . . will, if allowed to proceed, substantially burden the Adorers' exercise of their deeply held religious beliefs") with App. 33 ¶ 80 ("[T]here was no burden placed on the Adorers' religious exercise at the time the FERC Order was issued.").

11

III.[4]

A.

As we did in <u>Adorers I</u>, we find the Supreme Court's opinion in <u>City of Tacoma v. Taxpayers of Tacoma</u> to provide the controlling principle in this case, 357 U.S. 320 (1958). There, the City of Tacoma was to construct a power plant on the Cowlitz River under a license issued by the Federal Power Commission ("FPC"). <u>Id.</u> at 324. The building of the project required the City to take land used as a fish hatchery and owned by the State of Washington. <u>Id.</u> at 325. Unlike the situation in this case, the State there did object and unsuccessfully opposed the grant of the license by the FPC. <u>Id.</u> at 325-26. The State later moved successfully in the Superior Court of Washington for an order enjoining the City from proceeding to construct the project or sell any of its revenue bonds, an order which was then ultimately appealed and affirmed by the Supreme Court of Washington. <u>Id.</u> at 331-32.

The United States Supreme Court granted certiorari and reversed. It noted:

> This statute is written in simple words of plain meaning and leaves no room to doubt the congressional purpose and intent. It can hardly

---

[4] We have jurisdiction under 28 U.S.C. § 1291. We review threshold matters of justiciability de novo. <u>See</u> <u>In re Horizon Healthcare Servs. Inc. Data Breach Litig.</u>, 846 F.3d 625, 632 (3d Cir. 2017); <u>Hartig Drug Co. v. Senju Pharm. Co.</u>, 836 F.3d 261, 267-68, 267 n.8 (3d Cir. 2016).

12

be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had. So acting, Congress in § 313(b) prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders. It there provided that any party aggrieved by the Commission's order may have judicial review, upon all issues raised before the Commission in the motion for rehearing, by the Court of Appeals which 'shall have exclusive jurisdiction to affirm, modify, or set aside such order in whole or in part,' and that '[t]he judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final . . . . <u>It thereby necessarily precluded de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review</u>.

Id. at 335-36 (emphasis added).

The Court then concluded that the State's attempts to obtain recourse from the Washington state courts constituted "impermissible collateral attacks" on the approval by the FPC, which was reviewed and affirmed by the U.S. Court of Appeals for the Ninth Circuit. Id. at 341. As we observed in Adorers I, "the Supreme Court has long held that . . . statutory review scheme[s] [like that of the NGA, which channel all claims relating to the certification or licensing of interstate energy projects through an exclusive judicial review scheme], . . . 'necessarily preclude[] de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review.'" Adorers I, 897 F.3d at 197 (quoting Tacoma, 357 U.S. at 336, 341) (emphasis added). The rule that any claim raising issues "inhering in" the certification of a new interstate gas pipeline must first be presented to FERC—or else forfeited—also applies to claims that "could and should have been" raised during the certification process. Tacoma, 357 U.S. at 339. In commenting on this principle, the Tenth Circuit has remarked that it "would be hard pressed to formulate a doctrine with a more expansive scope." Williams Nat. Gas Co. v. City of Okla. City, 890 F.2d 255, 262 (10th Cir. 1989).

The well-established doctrine of "impermissible collateral attack" has been invoked by many of our sister courts of appeals to bar suits brought by persons aggrieved by the certification, construction, or operation of new interstate energy projects. See, e.g., Bohon v. FERC, 37 F.4th 663, 666 (D.C. Cir. 2022) (concluding that "[t]he Natural Gas Act's review scheme precluded district-court jurisdiction over the Bohons' collateral attack on the FERC order"); Otwell v. Ala. Power Co., 747 F.3d 1275, 1279 (11th Cir. 2014) (concluding that various property owners' state tort claims regarding the water levels in a lake were barred as "impermissible collateral

14

attack[s]" on a FERC license to a hydroelectric dam company that permitted the company to change the water levels in the lake); Am. Energy Corp. v. Rockies Exp. Pipeline LLC, 622 F.3d 602, 605 (6th Cir. 2010) (concluding that a coal company's various claims were barred as impermissible collateral attacks on a FERC certificate and explaining that "[e]xclusive means exclusive, and the Natural Gas Act nowhere permits an aggrieved party otherwise to pursue collateral review of a FERC certificate in state court or federal district court"); see also Simmons v. Sabine River Auth. La., 732 F.3d 469, 477 (5th Cir. 2013) (not applying Tacoma but otherwise concluding that a property owner's state negligence claim for damages caused by floods resulting from the opening of a hydroelectric dam was an improper "attempt to force changes to a FERC-issued license").

The Eleventh Circuit's opinion in Otwell is particularly instructive. 747 F.3d 1275. Alabama Power operated a hydroelectric dam on a lake for decades, under a license from the FPC. Id. at 1277. As the license approached its expiration, the utility sought to renew the license on new terms. Id. at 1278. Contrary to its long-existing practice, the utility sought to lower the water level in the lake and release water at various times of the year to cool a downstream power plant. Id. The Smith Lake Improvement and Stakeholders Association ("SLISA"), comprised of some of the landowners from around the lake, intervened in the FERC proceedings and opposed the renewal. Id. It requested that the utility maintain higher water levels in the lake and minimize the release of water downstream. Id. FERC rejected SLISA's requests and granted the utility a license to operate at the lower water level, which it then did. Id.

15

Some members of SLISA then filed a putative class action in state court against the utility, later removed to federal district court, claiming that its lowering of the water in the lake caused tortious injury to their property. Id. To remedy their injuries, the plaintiffs sought "monetary damages, a declaratory judgment[,] . . . and an injunction requiring [the utility] to construct cooling towers at [the downstream power plant]." Id. at 1279. The district court granted summary judgment to the utility concluding that the plaintiffs' claims "were an impermissible collateral attack on the FERC's . . . relicensing order." Id. at 1279. The Eleventh Circuit agreed. Id. at 1277.

Relying on the principle articulated in Tacoma, the Eleventh Circuit wrote that "Appellants cannot escape [Congress' exclusive review scheme] by arguing that they are pursuing different claims and different relief than the parties before the FERC." Id. at 1281 (citing Tacoma, 357 U.S. at 336). "[T]heir . . . claims are inescapably intertwined with a review of the FERC's final decision." Id. at 1282 (emphasis added) (citations omitted). "The review entailed by Appellants' claims is statutorily dedicated to the court of appeals." Id.

The Court further concluded that the landowners were barred from advancing their state tort claims against the utility even though they were not themselves intervenors in the relicensing proceedings. The Court explained,

> [w]e do not read [the exclusive jurisdiction scheme] as allowing any person or entity that was not a party to the FERC proceedings to

16

collaterally challenge the final order resulting from those proceedings. Instead, we read [it] as <u>limiting the persons who may seek judicial review</u> of an order of the FERC to those parties who participated in the FERC proceedings. Thus, <u>non-parties to the proceedings before the FERC</u> may not contest the agency's final decision in an alternative forum by bringing challenges that are <u>inescapably intertwined with a review of the agency's final determination</u>.

<u>Id.</u> at 1282 (emphasis added) (internal citations omitted). This reading, the court continued, "prevents the [exclusive jurisdiction] provision from being rendered nugatory." <u>Id.</u> Indeed, to read the provision in any other way would allow,

<u>any person or entity</u> with an interest in the proceedings before the FERC [to] evade the . . . <u>exclusive judicial review provision by simply choosing not to participate in the proceedings</u>, or by creating a corporate entity to champion its interests before the agency. Then, following an adverse order, the non-participants could obtain a collateral redetermination of <u>the identical</u>

> issues considered and rejected in the FERC's final order because those persons were not parties to the proceedings. Such a construction of the statute would do violence to Congress's deliberately crafted administrative scheme.

Id. at 1282-83 (emphasis added). In the Eleventh Circuit's view, whether a party's claim is an impermissible collateral attack upon a FERC order centers on whether the adjudication of the claim would require the court to review any issues "inescapably intertwined" with the earlier FERC certification process. Id. at 1282.

The Eleventh Circuit thus added another way of determining whether the later proceeding involved issues that "inhered in" the certification process and constituted an impermissible collateral attack on a FERC decision. It looked to whether the later claim raised issues "inescapably intertwined" with the FERC certification process. This tracks the approaches of other courts of appeals.

The D.C. Circuit in Bohon, for example, focused on whether the plaintiff's claims were "anchored in [the] pipeline proceedings" and, if successful, would "directly imperil[] a specific certificate that FERC granted." 37 F.4th at 666. And the Sixth Circuit in Am. Energy Corp. focused on whether the "heart of th[e] claim[]" was bound up in the operation of the pipeline, which was authorized by FERC's certificate. 622 F.3d at 605. No matter the specific language employed by our various sister courts of appeals to describe the analysis, in

18

answering the question of whether a claim is an impermissible collateral attack, they each focus their attention not on the plaintiffs' characterization of their claim but rather on whether the claim "could and should have" been presented to FERC because the claims raise "issues inhering in the controversy." Tacoma, 357 U.S. at 336, 339.

The Adorers urge that the Supreme Court's recent opinion in PennEast Pipeline Co. v. New Jersey, supports their position that theirs is not a collateral attack. 141 S. Ct. 2244 (2021). We disagree.

There, as in Tacoma, the recipient of a certificate of public convenience and necessity sought to exercise its eminent domain power against state lands. Id. at 2253. The State of New Jersey, however, opposed the condemnation proceedings on sovereign immunity grounds. Id. It lost before the district court, but we reversed because we did not think that 15 U.S.C. § 717f(h) clearly delegated the federal government's power to pierce states' sovereign immunity along with its eminent domain power. Id. at 2253–54. The Supreme Court granted certiorari and, before reaching the merits of the dispute, held that New Jersey had not launched a collateral attack on the FERC order granting PennEast's certificate. Id. at 2254. The Court explained that this case was unlike Tacoma, because

> New Jersey does not seek to modify FERC's order; it asserts a defense against the condemnation proceedings initiated by PennEast. To determine whether the District Court correctly rejected New

19

Jersey's defense, the Third Circuit needed to decide whether § 717f(h) grants natural gas companies the right to bring condemnation suits against States. Its conclusion that § 717f(h) does not authorize such suits did not "modify" or "set aside" FERC's order, which neither purports to grant PennEast the right to file a condemnation suit against States nor addresses whether § 717f(h) grants that right.

Id.  Even though the state asserted a counterclaim that would have the effect of negating the route that FERC had set up via the regulatory process, it was not a collateral attack because asserting the sovereign immunity defense is not the same as "arguing that a licensee could not exercise the rights granted to it by the license itself."  Id. (emphasis added).  Our determination as to whether the NGA delegated the federal power to pierce states' sovereign immunity did not touch the FERC order at all.  See id.

The Adorers urge that Tacoma is distinguishable and PennEast is the better analogue here because the "appropriate relief" that is due to them under RFRA is monetary damages, 42 U.S.C. § 2000bb-1(c), and granting those does not modify or set aside Transco's certificate.  We disagree.  The fact remains that their allegation that the presence and operation of the pipeline on their property violated their rights under RFRA is the essence of both lawsuits.  This could and should have been contested before FERC during the certification

20

proceedings where such issues were to be resolved.[5] The appropriate court of appeals could then have reviewed and remedied any insufficiency in FERC's resolution of the Adorers' claim. But, again, having failed to avail themselves of the exclusive review scheme established by Congress under the NGA for adjudicating such claims, the Adorers' claim is now barred as an impermissible collateral attack.

The Tenth Circuit's analysis in Save the Colorado v. Spellmon, --- F.4th ----, No. 21-1155, 2022 WL 4588319 (10th Cir. Sept. 30, 2022) leads us to the same result. There, the court let the opponents of plans to raise a local dam and expand the reservoir behind it sue in the district court, but the basis for their lawsuit was completely distinguishable from the Adorers'. The at-issue agency approvals did not come from FERC, but from the Army Corps of Engineers and the United States Fish and Wildlife Service. Save the Colorado, 2022 WL 4588319, at *2, *7. After analyzing the underlying statutory

---

[5] Indeed, the more "appropriate relief," as the District Court noted, was presumably a rerouting of the pipeline around their property. App. at 11. The thrust of RFRA is the prevention or elimination of a violation, not simply the compensation for spiritual harms after the fact by an award of money. See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 140 S. Ct. 2367, 2395 (2020) (Alito, J., concurring) (emphasis added) (citation omitted) (explaining that "[o]nce it [is] apparent that [the Government's action] [runs] afoul of RFRA, the Government [i]s required to eliminate the violation. RFRA does not specify the precise manner in which a violation must be remedied; it simply instructs the Government to avoid 'substantially burden[ing]' the 'exercise of religion'—i.e., to eliminate the violation.").

claims that the plaintiffs had brought and determining whether each underlying issue inhered in the controversy per Tacoma, id. at *7–12, the Tenth Circuit concluded that even though "the municipality needed a discharge permit to raise the dam and expand the reservoir—matters subject to [FERC's] licensing decision," because the NGA did not govern the licenses granted by the Corps or Service and FERC could not hear challenges to those licenses, the plaintiffs' "claims did not attack the merits of [FERC's] approval of an amended license," id. at *14. Therefore, this was not a collateral attack. Id. at *5, 14.

The Tenth Circuit noted that this conclusion was consistent with Adorers I, because the breadth of FERC's authority was not an issue in that case. Id. at *9. Here, there is no question that FERC can adjudicate RFRA claims, see Snoqualmie Indian Tribe v. FERC, 545 F.3d 1207, 1213 (9th Cir. 2008) (noting that FERC had evaluated the tribe's RFRA claim before relicensing a hydroelectric project), and the Adorers do not attack any license that Transco has received from any other agency, so Save the Colorado does not advance the Adorers' cause.

B.

In this case, we conclude the Adorers' RFRA claim is an impermissible collateral attack on the FERC certificate because the claim could and should have been raised before FERC. Their RFRA claim raises issues inhering in the controversy, namely the route, construction, and operation of the pipeline through the Adorers' property. The Adorers allege that "Transco's action in placing the Pipeline in to [sic] service using the Adorers' land caused a substantial burden to the

22

religious exercise of the Adorers in violation of RFRA." App. at 37 ¶ 111 (emphasis added). They also allege that it was Transco's "use [of their] private property . . . to install and operate a natural gas pipeline that . . . "damage[d] . . . the Adorers." App. at 39 ¶ 117. These allegations make plain that their RFRA claim is "anchored in [the] pipeline." Bohon, 37 F.4th at 666. It is "inescapably intertwined" with the pipeline's route, construction, and operation. Otwell, 747 F.3d at 1282. And the "heart of th[e] claim[]" challenges the operation of the pipeline, which was authorized after extensive, public proceedings before FERC as required by the NGA and FERC regulations. Am. Energy Corp., 622 F.3d at 605.

The consequences of a hypothetical victory for the Adorers betray the collateral nature of their RFRA damages suit. Were the Adorers to succeed on their RFRA claim, moreover, a damages award could conceivably affect, among other things, the price of gas flowing to Transco's customers, the gas flow rate, and the general fiscal and economic impact of operating the pipeline. Such a result would no doubt impermissibly, "directly imperil[]" the FERC certificate and would otherwise undermine the certification procedure Congress created in enacting the NGA. Bohon, 37 F.4th at 666. Furthermore, it would cause potential contractors to think twice before embarking on a costly project only to later face claims for damages caused by the pipeline. Thus, the Adorers' claim is, like the plaintiffs' claims in Tacoma, Otwell, Williams, Bohon, and Am. Energy, an impermissible collateral attack.

23

C.

We cannot conclude without addressing three specific contentions pressed by the Adorers in their briefs and at oral argument. First, they urge that because FERC cannot award money damages, this suit was properly brought in District Court.[6] But this argument makes little sense. Had they proceeded with an objection before FERC, and convinced the Commission of a violation, no doubt the Commission would have provided relief—by rerouting the pipeline or otherwise attaching some condition upon the permit as it did in countless other instances—and if it did not, the Adorers would have had recourse to an appeal to an appropriate court of appeals. If their claim was valid, they would have suffered no harm. Moreover, any claim for damages would not have been cognizable as no damage had yet occurred. Whether FERC can or cannot award damages is irrelevant.

Second, the Adorers essentially repeat the argument they made in Adorers I, that their claim was not ripe at the time FERC issued the certificate, but rather, the claim began to accrue only once Transco "plac[ed] the Pipeline in to [sic] service," App. at 37 ¶ 111, thereby, placing a burden upon their religious exercise. In addition to the reason we previously rejected this claim,[7] we note that were we to adopt the Adorers' suggestion that they were under no obligation to present their RFRA claim to FERC because the claim was not ripe, the court would effectively exempt all claims against a new pipeline's construction and operation from the NGA's review scheme. Such a rule would entirely upend Congress's intent.

---

[6] Appellants' Br. at 40-47.

[7] See above Section II.

24

Third, the Adorers urge that because Transco knew of their objection to the pipeline and neither it nor FERC brought them into the administrative proceeding to resolve it, they should somehow be permitted to proceed in federal court. But this turns the administrative process on its head. It is not up to the pipeline contractor or FERC to seek out potential objectors at its peril. To the contrary, objectors who sit on their hands and do not raise their concerns in the administrative process do so at their peril. To permit a party to reserve a claim, the success of which would directly imperil a FERC decision to certify an interstate pipeline, by remaining silent during the FERC proceedings only to raise the claim in de novo litigation in a different forum of its own choosing would contravene Congress' decision to channel all such claims through the NGA's exclusive review framework. Such a result would also contravene the Supreme Court's long-standing precedent in Tacoma.

## IV.

For these reasons, we will affirm the District Court's order granting Transco's motion to dismiss.

25